517 A.2d 1270

**Allen L. FEINGOLD, Esquire, Appellant,**

**v.**

**SOUTHEASTERN PENNSYLVANIA TRANSPORTATION AUTHORITY**

**and**

**Darrell Kenneth Duncan, Appellees.**

Supreme Court of Pennsylvania.

Argued April 16, 1986.

Decided Nov. 18, 1986.

M. Mark Mendel, Philadelphia, for appellant.

Samuel J. Pace, Perry S. Bechtle, Philadelphia, for appellees.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

McDERMOTT, Justice.

This is an appeal from the order of the Superior Court which reversed the judgment of the Court of Common Pleas of Philadelphia.

Appellant, Allen L. Feingold, Esquire, filed a complaint in trespass against appellees, Southeastern Pennsylvania Transportation Authority (SEPTA) and Darrell Kenneth Duncan,[1] in May, 1975, as a result of an automobile accident which occurred between the parties on September 17, 1974. SEPTA did not contest its liability, so the issues for trial were reduced to appellant's alleged aggravation of pre-existing voice and throat problems and his alleged loss of earnings as a lawyer. The complaint was amended in March, 1976, to include a count for punitive damages.

The trial commenced on October 27, 1980, and ten days thereafter the jury returned a verdict for appellant in the amount of $218,000 in compensatory damages and $50,000 in punitive damages. On November 14, 1980, the trial judge awarded $28,048.14 in delay damages, bringing the judgment in its entirety to the amount of $296,048.14. Post-trial motions were subsequently denied on June 23, 1982.

On appeal the Superior Court reversed on the basis of erroneous evidentiary rulings and an improper computation of damages. Appellant then sought allowance of appeal, and we granted review to consider the following issues: whether the trial court erred in denying SEPTA's requests to present certain testimony; and whether it was proper to assess punitive damages against SEPTA. Based on the

1. Duncan was the operator of the bus owned by SEPTA which struck appellant's car. Although the instant action is against SEPTA and Mr. Duncan individually, they will be referred to collectively as "SEPTA" herein.

ensuing reasons, we affirm the order of the Superior Court, and remand the matter for a new trial.

## ADMISSIBILITY OF EVIDENCE

Regarding the evidentiary errors, the Superior Court held: first, that the trial court erred in precluding the admission of testimony of appellant's treating physician, when said doctor was called as an expert on behalf of SEPTA; and second, that the trial court erred in barring testimony offered by SEPTA, which consisted of testimony from two common pleas court judges who would have discussed whether appellant's injuries affected the disposition of the cases he had pending in the Court of Common Pleas of Philadelphia.

The facts germane to a consideration of the first error are as follows.

In March of 1980, approximately seven months prior to trial, the parties to the instant action filed pre-trial statements. Appellant listed Dr. Joseph P. Atkins, Jr., as a treating physician and expert witness. Furthermore, appellant stated that the witness and exhibit list submitted in the pre-trial statement were incomplete as of that date. Neither party certified that discovery was complete and the trial court never entered a pre-trial order limiting the number of witnesses each party would be allowed to call. Appellant did not call Dr. Atkins to testify at trial, admitting through counsel that he was aware of the conflicting nature of the doctor's testimony with respect to his proposed theory of liability. SEPTA's attempt to call the doctor in its case in chief was thwarted by the trial court because of the absence of his name from SEPTA's pre-trial statement. Appellant thereafter entered the doctor's records into evidence.

In support of his position that the trial court properly excluded the doctor's testimony appellant argues that a failure to identify proposed testimony constitutes prejudicial error, which cannot be overlooked, and that the Rules of

Civil Procedure authorized the trial judge's actions. The rules in issue involve both local and state-wide rules.

This Court's approach to the enforcement of procedural rules, whether local or state-wide, is dictated by the facts and circumstances in each individual case. To analyze otherwise would exalt procedural rules, which were created for efficiency and fairness, to a status far beyond their inherent power. "It has been our policy to overlook ... procedural errors when a party has substantially complied with the requirements of the rule and no prejudice would result. 'Procedural rules are not ends in themselves, but means whereby justice, as expressed in legal principles, is administered. They are not to be exalted to the status of substantive objectives,' " *Pomerantz v. Goldstein*, 479 Pa. 175, 178, 387 A.2d 1280, 1281 (1978) (citation omitted).

■ Additionally, this Court has previously held that local rules cannot be construed so as to be inconsistent with the prevailing state-wide rules. *See Byard F. Brogan, Inc. v. Holmes Electric Protective Company of Philadelphia*, 501 Pa. 234, 460 A.2d 1093 (1983).

At the time of trial in this matter the Philadelphia local practice rules required:

> In addition to concisely setting forth his factual contentions, each party shall include the following in his pre-trial statement: ... (4) a list by name and address of all witnesses the party intends to call at trial, except those who may be used for rebuttal or impeachment purposes. If the parties learn the names of any additional witnesses after the pre-trial conference, they will promptly exchange names and addresses.

Civil Trial Manual of the Court of Common Pleas of Philadelphia, pp. 41–42. It was further required by the Manual that the pre-trial conference judge should dictate an order upon the conclusion of the conference which would include "(c) a list of all non-rebuttal witnesses who may be called at trial." *Id.* The Superior Court correctly noted that such an order was not entered in the instant case.

The relevant Pennsylvania Rule of Civil Procedure is Pa.R.Civ.P. 4003.5 which provides:

> Rule 4003.5 Discovery of Expert Testimony. Trial Preparation Material.
>
> . . . .
>
> (b) If the identity of an expert witness is not disclosed in compliance with subdivision (a)(1) of this rule, he shall not be permitted to testify on behalf of the defaulting party at the trial of the action. *However, if the failure to disclose the identity of the witness is the result of extenuating circumstances beyond the control of the defaulting party, the court may grant a continuance or other appropriate relief.*

Pa.R.Civ.P. 4003.5 (emphasis added). *See also* Pa.R.Civ.P. 4019(i).

Rule 4003.5(b) specifically provides that the presiding court must balance the facts and circumstances of each case to determine the prejudice to each party. In reversing the trial court's exclusion of Dr. Atkin's testimony, the Superior Court relied on several factors "[i]n determining whether to allow the testimony of a witness who has not been included in a pre-trial memorandum." *Feingold v. SEPTA*, 339 Pa.Super. 15, 21, 488 A.2d 284, 287 (1985).

> [B]ad faith on the part of the party seeking to call witnesses not listed in his pretrial memorandum; *see Clark v. Pa.R.R.Co.*, 328 F.2d 591 (2d Cir.1964), *cert. denied*, 377 U.S. 1006, 84 S.Ct. 1943, 12 L.Ed.2d 1054 (1964); ability of the party to have discovered the witnesses earlier, *see Hunt v. Pa.R.R.Co.*, 41 F.R.D. 349 (E.D.Pa.1967); validity of the excuse offered by the party, *Thompson v. Calmar Steamship Corp.*, 331 F.2d 657, 662 (3d Cir.1964); willfulness of the party's failure to comply with the court's order, *Taggart v. Vermont Transportation Co.*, 32 F.R.D. 587 (E.D.Pa.1963), *aff'd*, 325 F.2d 1022 (3d Cir.1964); the parties' (sic) intent to mislead or confuse his adversary, *Pakech v. American Export Isbrandtsen Lines, Inc.*, 69 F.R.D. 534 (E.D.Pa. 1967); and finally, the importance of the excluded testi-

mony, *Clark, supra.* Underlying the cases to which we have adverted are these basic considerations: (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith of (sic) willfulness in failing to comply with the court's order.

*Id.,* 339 Pa.Superior Ct. at 21, 488 A.2d at 288, citing *Meyers v. Pennypack Woods Home Ownership Association,* 559 F.2d 894, 904–05 (3d Cir.1977).

■ We agree with the Superior Court that the facts in the instant case fail to show any prejudice to appellant. Dr. Atkins was appellant's treating physician. Appellant had listed him as a witness at the time of the pre-trial conference. Furthermore, appellant filed answers to SEPTA interrogatories five days prior to trial, listing the doctor as an expert witness. Appellant had access to the doctor's records and knew what the substance of his testimony would be. Since appellant listed Dr. Atkins as a trial witness and then chose not to call him, cries of "prejudice" when SEPTA attempted to call the doctor on its own behalf are rather disingenuous.

■ Finally, with respect to the trial court's exclusion of Dr. Atkins testimony, appellant contends that the privilege of communication between a doctor and his patient precludes the admission of such testimony at trial. There is absolutely no merit to this claim, especially where the appellant has brought an action in personal injury and certain medical claims are at issue. *See* 42 Pa.C.S. § 5929.[2]

2. § 5929. Physicians not to disclose information

No physician shall be allowed, in any civil matter, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil matters brought by such patient, for damages on account of personal injuries.

42 Pa.C.S. § 5929.

The next issue concerns the appropriateness of the trial court's exclusion of the testimony of the common pleas judges who were offered as rebuttal witnesses by SEPTA. The trial judge's ruling on this evidence was based on the same local rule cited above.[3]

The evidence in question consisted of testimony by two judges, the Honorable Stanley M. Greenberg and the Honorable Joseph P. Braig, who were offered as rebuttal witness concerning appellant's loss of earnings claim. Appellant successfully contended below that SEPTA's failure to list the judges in the pre-trial statement was fatal to its plan to call them as witnesses. This contention falters under close analysis of the procedural matrix of the instant case. The local rule excuses the listing of a witness if he or she is to be offered in rebuttal or as impeachment. Our analysis thus turns to whether the judges were rebuttal or impeachment witnesses.

At the time these witnesses were offered appellant had testified that he was afforded the sympathy of judges and the adjustment of court time and appearances due to his state of health. Appellant had not previously mentioned this in his pre-trial statement or discovery materials. He fortified this point by identifying a settlement program which he alleged was instituted to help out his personal caseload due to the gravity of his injury. SEPTA then attempted to call the judges in question to rebut this testimony. The trial court disallowed the proffered testimony as not constituting proper rebuttal or impeachment testimony, the only type of testimony which did not necessitate the listing of witnesses in the pre-trial statement.

■ In *Commonwealth v. Hamm*, 474 Pa. 487, 378 A.2d 1219 (1977) this Court stated:

A witness may ... be impeached with proof that on a previous occasion he made a statement inconsistent with his present testimony as well as *by the testimony of*

**3.** See p. 1272, *supra*.

*other witnesses whose version of the facts differ from that of the witness being impeached.* J. McCormick, evidence § 33 (2d ed.1972).

*Id.*, 474 Pa. at 500, n. 11, 378 A.2d at 1226, n. 11 (emphasis added). Furthermore, this Court has held that "[a] litigant has the privilege of offering rebuttal testimony, and where the evidence proposed goes to the impeachment of the testimony of his opponent's witnesses, it is admissible as a matter of right." *Flowers v. Green*, 420 Pa. 481, 484, 218 A.2d 219, 220 (1966) *quoting Schoen v. Elsasser*, 315 Pa. 65, 172 A. 301 (1934).

As previously stated, the trial court here did not enter an order defining issues or limiting the number of witnesses to be called at trial. Appellant failed to specify the exact nature of his loss of wages claim, never revealing until trial the assertion that the trial courts set up a special program to deal with his caseload due to his infirmity; this despite the fact that he was questioned on this matter through the pre-trial statement, deposition, and interrogatories. Under these circumstances it was inequitable to exclude this testimony which was offered to show that the special program was enacted on account of appellant's heavy caseload alone, rather than his inability to deal with it due to the alleged injuries.

## ASSESSMENT OF PUNITIVE DAMAGES AGAINST SEPTA

As previously stated, the verdict resulted in appellant receiving compensatory damages for the injuries incurred, plus punitive damages which were assessed against SEPTA because its agents "intentionally, knowingly or with reckless indifference to the interests of others, ordered and/or permitted the bus to be operated in a dangerous and defective condition." *Feingold v. SEPTA*, 8 Phila. 321, 333–34 (1982). The Superior Court reversed the trial court's award of punitive damages against SEPTA, holding "that punitive damages are not recoverable against an agency of the

Commonwealth ..." *Feingold v. SEPTA*, 339 Pa.Super. 15, 31, 488 A.2d 284, 293 (1985).

Our discussion thus centers initially on whether SEPTA constitutes an agency of the Commonwealth; then, if it is determined that it does, our analysis turns to whether punitive damages should be assessed against it.

SEPTA is a regional transportation authority created by an act of the General Assembly.[4] It presently operates under the Pennsylvania Urban Mass Transportation Law.[5] Its operating powers have been clearly delineated:

§ 600.303. Creation of transportation authorities; rights and powers

(a) There is hereby authorized the creation of a separate body corporate and politic in each metropolitan area, to be known as the transportation authority of such area, extending to and including all of the territory in the metropolitan area. *An authority shall in no way be deemed to be an instrumentality of any city or county or other municipality or engaged in the performance of a municipal function, but shall exercise the public powers of the Commonwealth as an agency and instrumentality thereof.* An authority shall exist for the purpose of planning, acquiring, holding, constructing, improving, maintaining, operating, leasing, either as lessor or lessee, and otherwise functioning with respect to, a transportation system in the metropolitan area, and, outside of such area, whether within or beyond the boundaries of the Commonwealth, to the extent necessary for the operation of an integrated system and for the provision of all group and party services which can be provided by transportation systems subject to acquisition under this article: Provided, however, That all services rendered by the authority outside the metropolitan area shall be pursuant to certificates of public convenience or other

4. 66 P.I.C.S. § 2002. Repealed. 1968 Jan. 22, P.L. 42, No. 8, as added by Act 1980, July 10, P.L. 427, No. 101, § 3, imd. effective. (Metropolitan Transportation Authorities Act.)

5. 55 Pa.S. § 600.101 et seq.

appropriate authorization issued to it by the Pennsylvania Public Utility Commission, or other appropriate regulatory agency of any State or the Federal Government. An authority shall transact no business or otherwise become operative until and unless a majority of its board shall have been qualified in accordance with this article.

55 Pa.S. § 600.303(a) (emphasis added).

Although this Court has yet to determine the extent of SEPTA's nexus with the Commonwealth, the federal court has offered insight on the issue. In *Crilly v. SEPTA*, 529 F.2d 1355 (3d.Cir.1976), the Third Circuit Court of Appeals was confronted with the question of whether SEPTA was a political subdivision of the Commonwealth and thus exempt from coverage under the Wagner and Taft-Hartley Acts. In holding SEPTA an agency of the Commonwealth, the Court reasoned as follows:

> SEPTA was created by an act of the state legislature as an "agency and instrumentality" of the Commonwealth to "exercise ... public powers", including that of eminent domain. Metropolitan Transportation Authorities Act of 1963, as amended, 66 Pa.Stat.Ann. § 2001 *et seq.* (Supp.1975). It is governed by a Board of Directors composed of an *ex officio* member appointed by the Governor of Pennsylvania, two members from each of the five counties in its designated service area—Bucks, Chester, Delaware and Montgomery—who are appointed by their respective county commissioners, and two members appointed by the Mayor of Philadelphia with the approval of City Council. 66 Pa.Stat. § 2016(a)(1). Thus, SEPTA falls squarely within the meaning of public subdivision as that term is used in § 2(2) of the Wagner Act.

529 F.2d at 1358.[6]

■ Additionally, the Urban Mass Transportation Law specifically describes SEPTA's responsibility "to act as *an*

---

6. The Third Circuit Court based its holding on a standard established by the United States Supreme Court, which was used to determine whether an entity is a political subdivision of a state for the purposes of the Taft-Hartley Act. "[A]n entity [is] a political subdivision if it

*Agent of the State, or of the Federal Government or any of its instrumentalities or agencies,* for the public purpose set out in [the Act]." 55 Pa.S. § 600.303(d)(25) (emphasis added). Thus, we have no hesitation in concluding that SEPTA was intended to be considered an agency of the Commonwealth.

Our inquiry now turns to whether it is appropriate to award punitive damages against a defendant/agent of the Commonwealth.

In this Commonwealth "[T]he right to punitive damages is a mere incident to a cause of action—an element which the jury may consider in making its determination— and not the subject of an action in itself." *Hilbert v. Roth,* 395 Pa. 270, 276, 149 A.2d 648, 652 (1959) (citations omitted). Unlike compensatory damages, which have as their purpose the desire to make the plaintiff whole, the purpose of imposing punitive damages is to punish the wrongdoers and to deter future conduct. *Voltz v. General Motors Acceptance Corporation,* 332 Pa. 141, 144, 2 A.2d 697, 698 (1938); *Thompson v. Swank,* 317 Pa. 158, 159, 176 A. 211 (1934).

Traditionally, government agencies have been exempt from the imposition of punitive damages. *See Hermits of St. Augustine v. County of Philadelphia,* 4 Clark 120, 7 Pa.L.J. 124 (1847).[7] In discussing the historical perspective of barring the imposition of punitive damages against a public entity, the Supreme Court of the United States has offered the following rationale:

In general, courts viewed punitive damages as contrary to sound public policy, because such awards would burden

was 'either (1) created directly by the state; so as to constitute departments or administrative arms of the government, or (2) administered by individuals who are responsible to public officials or to the general electorate.' 402 U.S. at 604–05, 91 S.Ct. at 1749." 529 F.2d at 1358 *citing National Labor Relations Board v. Natural Gas Utility District,* 402 U.S. 600, 91 S.Ct. 1746, 29 L.Ed.2d 206 (1971).

7. *Hermits* prohibited the imposition of exemplary damages against a county government, but is often cited as the precursor for the theory that punitive damages are inappropriate against a government entity. *See Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981).

the very taxpayers and citizens for whose benefit the wrongdoer was being chastised. The courts readily distinguished between liability to compensate for injuries inflicted by a municipality's officers and agents, and vindictive damages appropriate as punishment for the bad-faith conduct of those same officers and agents. Compensation was an obligation properly shared by the municipality itself, whereas punishment properly applied only to the actual wrongdoers. The courts thus protected the public from unjust punishment, and the municipalities from undue fiscal constraints.

*Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 263, 101 S.Ct. 2748, 2757–58, 69 L.Ed.2d 616 (1981).

■ Since the abolition of the common law doctrine of sovereign immunity, victims may now recover compensatory damages for injuries negligently caused by the Commonwealth and its agents. *See Mayle v. Pennsylvania Department of Highways*, 479 Pa. 384, 388 A.2d 709 (1978); 42 Pa.C.S. § 8501 *et seq.* [8] Thus, we are not here faced with a situation where the person who has been injured will be left without recourse. What we are faced with is a situation where the public policy implications of assessing damages, effectively against the taxpayers and public at large, must be weighed against the necessity of punishing the entity which has been entrusted with performing a public function. In *Newport v. Fact Concerts, Inc., supra,* the Supreme Court of the United States addressed this issue thusly:

Regarding retribution, it remains true that an award of punitive damages against a municipality "punishes" only the taxpayers, who took no part in the commission of the tort. These damages are assessed over and above the amount necessary to compensate the injured party.

8. Appellant attempts to argue that our erosion of the sovereign immunity doctrine as exemplified in *Mayle* can be extended to punitive damages. The only damages which are permitted against the Commonwealth, either by order of this Court or by statute, are those that are compensatory in nature. *See also* 1 Pa.S.C. § 2310; 42 Pa.C.S. § 8522.

Thus, there is no question here of equitably distributing the losses resulting from official misconduct. Cf. *Owen v. City of Independence*, 445 U.S. [622] at 657 [100 S.Ct. 1398 at 1418–19, 63 L.Ed.2d 673 (1980)]. Indeed, punitive damages imposed on a municipality are in effect a windfall to a fully compensated plaintiff, and are likely accompanied by an increase in taxes or reduction of public services for the citizens footing the bill. Neither reason nor justice suggests that such retribution should be visited upon the shoulders of blameless or unknowing taxpayers.

*Id.* at 267, 101 S.Ct. at 2759–60.

■ We agree with the concerns expressed by that Court. Therefore, we conclude that it would be inappropriate to assess punitive damages against SEPTA given its status as a Commonwealth agency.

We affirm the Order of the Superior Court.

LARSEN, J., files a dissenting opinion.

LARSEN, Justice, dissenting.

The majority holds that it is improper to assess punitive damages against appellee, SEPTA (the Southeastern Pennsylvania Transportation Authority), "given its status as a Commonwealth agency." Majority op. at 581. As I perceive no basis in logic, justice or sound public policy for insulating SEPTA from the full measure of liability for its wrongdoing simply because of its "status as a Commonwealth agency," I dissent, and would reverse the order of the Superior Court and reinstate the jury's award of punitive damages.

As the majority states, "the purpose of imposing punitive damages is to punish the wrongdoers and to deter future conduct." *Id.* at 579. Of course, ordinary negligence will not justify an award of punitive damages. Only where the record supports a finding of outrageous (e.g., malicious, wanton, reckless, willful) conduct indicating reckless indifference to the person or property of the plaintiff will a

jury's award of punitive damages be sustained. *Feld v. Merriam*, 506 Pa. 383, 395–396, 485 A.2d 742, 747–48 (1984). As the trial court stated, in the case at bar there was testimony and evidence presented to support a finding that agents/employees of SEPTA, acting within the course of their employment, intentionally, knowingly or with reckless indifference to the interest and safety of others, permitted one of its vehicles to be operated despite known substantial defects, which defects caused the accident and injuries to plaintiff. *Feingold v. SEPTA*, 8 Phil.Co.Rep. 321, 333–34, (C.C.P.Phil.1982). Nevertheless, the majority does not believe that the policy supporting awards of punitive damages generally—punishment of wrongdoers and deterrence of future wrongdoing—would be served by permitting such awards against government agencies, for two reasons.

First, the majority observes that "[t]raditionally, government agencies have been exempt from the imposition of punitive damages. *See Hermits of St. Augustine v. County of Philadelphia*, 4 Clark 120, 7 Pa.L.J. 124 (1847)." Majority op. at 579. Second, the majority believes that punitive damages against SEPTA will punish only the "blameless and unknowing taxpayers" and will likely increase taxes or result in reduced services to the public. *Id.* at 581, quoting *Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 263, 101 S.Ct. 2748, 2757–58, 69 L.Ed.2d 616 (1981).

The "tradition" prohibiting punitive damages against government agencies was, however, largely a by-product of the antiquated doctrine of sovereign immunity which has lost its efficacy in modern times and has been thoroughly discarded by this Court. Much of what was said by this Court in *Ayala v. Philadelphia Board of Public Education*, 453 Pa. 584, 305 A.2d 877 (1973) and *Mayle v. Pennsylvania Department of Highways*, 479 Pa. 384, 388 A.2d 709 (1978), in the context of abolishing the common law [1] doctrines of local governmental and sovereign immuni-

---

**1.** We are concerned here only with the common law, as the statutory immunity for Commonwealth agencies was not in effect at times relevant to this cause of action. 42 Pa.C.S.A. §§ 8521–8528.

ty, applies with equal force to the "tradition" that punitive awards will not be allowed against a government agency, as well as to the notion that punitive damages against the agency will not serve to deter future wrongdoing and will not punish the "right" wrongdoer.

In *Ayala,* this Court stated:

[W]e must agree with Chief Justice Traynor of the California Supreme Court that "the rule of governmental immunity for tort is an anachronism, without rational basis, and has existed only by the force of inertia." *Muskopf v. Corning Hospital District, supra* [55 Cal.2d 211] at 216, 359 P.2d [457] at 460, 11 Cal.Rptr. [89] at 92 [1961]. . . .

\* \* \* \* \* \*

"[T]he torts of public employees are properly to be regarded, as in other cases of vicarious liability, as a cost of the administration of government, which should be distributed by taxes to the public." . . .

Imposition of tort liability will, thus, be more responsive to current concepts of justice. Claims will be treated as a cost of administration and losses will be spread among all those benefited by governmental action. . . .

Moreover, "where governmental immunity has had the effect of *encouraging laxness and a disregard of potential harm, exposure of the government to liability for its torts will have the effect of increasing governmental care and concern for the welfare of those who might be injured by its actions."* Note, The Discretionary Exception and Municipal Tort Liability: A Reappraisal, 52 Minn. L.Rev. 1047, 1057 (1968). As Dean Prosser has written: *"The 'prophylactic' factor of preventing future harm has been quite important in the field of torts. The courts are concerned not only with compensation of the victim, but with admonition of the wrongdoer.* When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course *a strong incentive to prevent the occurrence of the harm.* Not infrequently one reason for imposing

liability is the deliberate purpose of providing that incentive." Prosser, Handbook on the Law of Torts 23 (3d ed. 1964).

453 Pa. at 597, 599, 305 A.2d 877 (emphasis added; some citations omitted).

As the quoted passage from *Ayala* indicates, the prevention of future harm and admonition of the wrongdoer is a major factor in imposing liability upon a governmental agency and, as the majority notes, this too is the purpose of imposing punitive damages where the wrongdoer's conduct reaches the "outrageous" level and the punishment must be commensurately increased. When the tortious conduct of the agency's agents and employees exhibits a reckless disregard for the safety and property of others, an award of punitive damages serves as valid a purpose in connection with a government defendant as it does with a private, corporate defendant. In both cases, those responsible for ensuring the safety of their operations through proper employment hiring practices, training and policy formulation are punished for their employees' and agents' reckless, outrageous or wanton and willful misconduct that has injured another. The deterrent effect remains the same, whether the stockholders elect and pressure board members to hire supervisors who will prevent reoccurence of the tortious conduct, or whether the taxpayers elect and pressure the officials who appoint the Board of Directors to hire the supervisors who will prevent reoccurence of the tortious conduct. As Judge Murray C. Goldman stated in *Steffens v. SEPTA*, 83 Legal Intelligencier 717, (C.C.P.Phil.1980):

> The real issue is whether allowing punitive damages against municipal corporations will provide a public benefit. Notwithstanding past beliefs about lack of deterrent effect, there is no indication that the desired deterrent would not be achieved here. ... The court sees no reason why an award of punitive damages, especially in times of budget difficulties, would not work a desired effect upon the management of SEPTA. In fact, it is quite possible that there would be as great a deterrent

effect in this case as in any other, such as one involving a large private corporation with diverse ownership.

That the funds for punitive damages will come from the public is not determinative. The deterrent effect of the punitive damages may well result in the payment of less compensatory damages in the future, with the net effect for the public being positive.

There is the further consideration that punitive damages are not mandatory. Assuming the proper foundation of evidence is submitted, we are leaving to the jury, members of the public, the opportunity to decide in a given case whether an award of punitive damages would have a salutary influence. If the jury feels that punitive damages are not appropriate, they need not award them. But if the jury, obviously aware of the ultimate source of the funds, decides they should be awarded, there is no reason why it should be prevented from doing so.

The refusal to allow punitive damages against SEPTA is, therefore, little more than an artificial distinction based solely on "its status as a Commonwealth agency." As we stated in *Mayle, supra*:

Whatever justification ever existed for the doctrine that the Commonwealth is immune from liability for tortious conduct ... the doctrine's day has long since passed. *Under the doctrine, plaintiff's opportunity for justice depends, irrationally, not upon the nature of his injury or of the act which caused it, but upon the identity or status of the wrongdoer.* Three times in recent years we have repudiated as unfair similar [status-based immunities.]

479 Pa. at 386, 388 A.2d 709 (emphasis added; citations omitted). Distinctions based solely on the status of the defendant are arbitrary and violate equal protection principles embodied in the Constitutions of this Commonwealth and of the United States. *James v. SEPTA*, 505 Pa. 137, 149–152, 477 A.2d 1302, 1308–09 (1984) (Larsen, J., dissenting). Article I, section 26 of the Pennsylvania Constitution, adopted May 16, 1967, provides: "Neither the Common-

wealth nor any political subdivision thereof shall deny to
any person the enjoyment of any civil right, nor discrimi-
nate against any person in the exercise of any civil right."
And the equal protection clause of the Fourteenth Amend-
ment directs that no state shall make or enforce any law
which shall "deny to any person within its jurisdiction the
equal protection of the laws."

As I stated in *Carroll v. County of York*, 496 Pa. 363,
437 A.2d 394 (1981):

> *serious* equal protection problems are raised by legisla-
> tive classification based *solely* on the identity and/or
> status of one of the parties. [As] this Court's recent
> decisions have uniformly and unequivocally stressed,
> there are *"no reasons whatsoever"* for immunities that
> are strictly status-based. *Ayala v. Philadelphia Board
> of Public Education, supra,* 453 Pa. at 592, 305 A.2d 877
> (1973) (emphasis added). We further stated in *Ayala,* per
> Justice Roberts, "we must agree with Chief Justice Tray-
> nor of the California Supreme Court that 'the rule of
> governmental immunity is an anachronism, *without ra-
> tional basis....'*" *Id.,* 453 Pa. at 592, 305 A.2d 877.[9]

> [9.] Thus, even under the traditional "rational basis" test (i.e., wheth-
> er a classification is reasonable, not arbitrary, and rests upon a
> difference having a fair and substantial relation to a legitimate
> legislative purpose. *See Moyer v. Phillips,* 462 Pa. 395, 341 A.2d 441
> (1975) *and Tosto v. Pennsylvania Nursing Home Loan Agency,* 460 Pa.
> 1, 331 A.2d 198 (1975)) a classification based *solely* on status is in a
> grave constitutional predicament....

*Id.,* 496 Pa. at 381–382, 437 A.2d at 403–404. *See also
Smith v. City of Philadelphia,* 512 Pa. 129, 516 A.2d 306
(1986) (Larsen, J. dissenting).

It is particularly inappropriate to deny punitive damages
because of the "status as a Commonwealth agency" of the
appellee SEPTA in this case. SEPTA grew out of a govern-
ment "take-over" (or the Commonwealth equivalent of "na-
tionalization") of private transportation companies that
were performing proprietary functions for profit in South-
eastern Pennsylvania. The government take-over trans-
formed the status of these private operating authorities into
the "status as a Commonwealth agency." Had this "nation-

alization" not taken place, the wrongdoer/public carrier in the instant case would have been subject to punitive damages for the reckless conduct of its employees and agents. If the Commonwealth chose to "nationalize" all private businesses and operations located in Pennsylvania, then, according to the majority, there would be no recovery of certain damages by injured citizens of Pennsylvania. One of the hallmarks of our society is the respect and concern we demonstrate for the unfortunate individuals who have been injured by others as expressed in judicial redress and compensation for their injuries. The majority now erodes this hallmark. I would not allow the expedient of "nationalizing" a private operation to insulate that operation from the full measure of liability that would otherwise be imposed.

For the foregoing reasons, I dissent.