Kevin TOOGOOD

v.

OWEN J. ROGAL, D.D.S., P.C., and Owen J. Rogal, D.D.S., Individually and both d/b/a The Pain Center and Hrant Stone;

Appeal of Owen J. Rogal, D.D.S., and Owen J. Rogal, D.D.S., P.C.

Kevin Toogood

v.

Owen J. Rogal, D.D.S., P.C., and Owen J. Rogal, D.D.S., Individually and both d/b/a Owen J. Rogal, D.D.S., Ltd.P. and d/b/a The Pain Center, and Hrant Stone, M.D., by Thomas Stone, Executor of the Estate of Hrant Stone, M.D.

Appeal of Hrant Stone, M.D., by Thomas Stone, Executor.

Superior Court of Pennsylvania.

Submitted April 4, 2000.
Filed Nov. 15, 2000.
Reargument Denied Jan. 18, 2001.

Janis L. Wilson, Philadelphia, for Rogal.

Frank A. Gerolamo, Philadelphia, for Stone.

Joseph P. Green, West Chester, for Toogood, appellee.

Before McEWEN, President Judge, JOYCE and TAMILIA, JJ.

McEWEN, President Judge:

¶ 1 These consolidated appeals have been taken from the judgment entered, in this medical malpractice action, following the dismissal of the post-verdict motions filed by appellants, Owen J. Rogal, D.D.S., and Owen J. Rogal, D.D.S., P.C. (hereinafter "the Rogal appellants") and Thomas Stone, as executor of the estate of Hrant Stone (hereinafter "appellant Stone"). As we find that the trial court properly rejected the arguments of appellants, we affirm the judgment in the amount of $465,000 entered in favor of appellee, Kevin Toogood, and against the Rogal appellants.

¶ 2 The relevant facts have been summarized in the brief of the Rogal appellants as follows:

Kevin Toogood was involved in automobile accidents in 1989 and 1992. The latter of these accidents caused serious injuries to Toogood's head, jaw, back, and shoulder, and resulted in ringing in his ears and migraine headaches. By August of 1993, the pain was so severe that Toogood "wanted to die". Although he was treated by several physicians and prescribed powerful medication, the pain continued. In August of 1993, upon referral by one of his physicians, Toogood began to visit Dr. Rogal, a dentist, for treatment of jaw pain. The visits occurred at The Pain Center, a multi-disciplinary medical center providing various forms of care. While at The Pain Center for treatment of his jaw pain, Toogood also received nerve injections for treatment of severe back pain.

On December 13, 1993, Toogood received a paravertebral nerve block injection from Dr. Stone, an anesthesiologist at The Pain Center. Dr. Rogal did not administer the injection and he was not present when it was given. After receiving the injection, Toogood felt pain and sat in a recliner for some time before driving himself home in rush hour traffic. From home, he proceeded to the Chester County Hospital complaining of breathing difficulties. At the hospital, he was treated by William Dellevigne, M.D. Dr. Dellevigne diagnosed and repaired a pneumothorax[1], or collapsed lung. The hospital charges for the treatment totaled $15,333. Toogood recovered from the injury so fully that, as Dr. Dellevigne recalled, he never returned for a follow-up visit. Additionally, since he had not been working because of the 1992 car accident, the injury did not cause Toogood to miss any work. Indeed, his lawsuit claimed no economic loss at all.

Despite his recovery and lack of economic damages, Toogood filed a complaint against Dr. Rogal and Dr. Stone on February 21, 1996. The complaint alleged claims of negligence, battery, and failure to obtain informed consent against Dr. Stone. The complaint also asserted claims against Dr. Rogal on the basis of both direct and vicarious liability. However, prior to trial, Toogood withdrew the claims of direct liability

1. This Court has described a pneumothorax as follows:

Pneumothorax means technically "air in the chest". Medically it is a term used to describe a condition when the lung collapses because air is present in the cavity outside the lung. The lungs are encased in an envelope-like sac, called the pleural cavity, which is a vacuum. It is necessary to maintain this vacuum to sustain the mechanics of respiration. Anything which breaks the "seal" will cause the lung to collapse. If it is blood, the condition is called hemothorax; if it is water, it's called hydrothorax. In our case, it's air—thus pneumothorax.

*Earlin v. Cravetz,* 264 Pa.Super. 294, 399 A.2d 783, 785 n. 1 (1979).

and proceeded solely on the basis of vicarious liability.

Before he could be deposed, Dr. Stone died. Appellant Thomas Stone, the executor of Dr. Stone's estate, was substituted as defendant. The only other person in the room at the time of the injection was Dr. Stone's son, a nurse anesthetist, but he also died before his deposition could be taken. As a result of the deaths, Dr. Stone's estate filed a motion for summary judgment asserting that, under the Dead Man's Act, 42 Pa. C.S. § 5930, no adverse testimony could be offered against Dr. Stone. By order dated September 2, 1997, the Honorable Arnold L. New of the Philadelphia County Court of Common Pleas granted the motion and dismissed all claims against Dr. Stone except Dr. Rogal's cross-claim. Although the court's order premised on the Dead Man's Act precluded any adverse testimony against Dr. Stone, his estate acknowledged that it could not contradict Toogood's claim that Dr. Stone gave the injection which led to this litigation.

## I. *APPEAL NO. 1561 EDA 1999*

¶ 3 The Rogal appellants present the following four issues for our review [2]:

Whether Toogood failed to present a *prima facie* case of medical malpractice where the doctrine of *res ipsa loquitur* was inapplicable and where the testimony of his treating physician was both improper and insufficient as a matter of law.

Whether the trial court erred in failing to rule that the dismissal of the ostensible agent, Dr. Stone, extinguished any claim of vicarious liability against the ostensible principal, Dr. Rogal.

Whether the verdict of $465,000 was shockingly excessive such that a new trial or substantial remittitur is required where Toogood recovered from his injuries, suffered no work loss or other economic harm, and incurred medical expenses of only $15,333, or barely three percent of the jury's verdict.

Whether the trial court erred in failing to mold the verdict to reflect Dr. Rogal's right to indemnification where the verdict against him was premised solely on vicarious liability.

¶ 4 Appellants Rogal initially argue that they are entitled to judgment n.o.v. as a result of the failure of appellee Toogood to present a *prima facie* case of medical malpractice. Appellants argue that the doctrine of *res ipsa loquitur* was improperly employed under the facts of the instant case and contend that the expert testimony presented on behalf of appellee was both improperly admitted and insufficient as a matter of law. We disagree.

¶ 5 In order to set forth a *prima facie* case of medical malpractice, a plaintiff "must establish (1) a duty owed by the physician to the patient (2) a breach of duty from the physician to the patient (3) that the breach of duty was the proximate cause of, or a substantial factor in, bringing about the harm suffered by the patient, and (4) damages suffered by the patient that were a direct result of that harm." *Mitzelfelt v. Kamrin,* 526 Pa. 54, 62, 584 A.2d 888, 891 (1990). *Accord: Hightower–Warren v. Silk,* 548 Pa. 459, 463, 698 A.2d 52, 54 (1997); *Poleri v. Salkind,* 453 Pa.Super. 159, 683 A.2d 649, 653 (1996), *appeal denied,* 548 Pa. 672, 698 A.2d 595 (1997). Generally, in order to prove medical negligence, a plaintiff must introduce expert testimony to prove that the conduct at issue deviated from accepted standards of medical practice, and that that deviation caused injury to the plaintiff. *Brannan v. Lankenau Hospital,* 490 Pa. 588, 595, 417 A.2d 196, 199 (1980). In *Jones v. Harrisburg Polyclinic Hospital,* 496 Pa. 465, 437 A.2d 1134 (1981), the

---

**2.** Appellant Stone, in the appeal at No. 1562 EDA 1999, repeats the first two issues presented in this appeal.

Pennsylvania Supreme Court held that the requirement of expert testimony was applicable only to those instances where "there is no fund of common knowledge from which laymen can reasonably draw the inference or conclusion of negligence." *Id.* at 472, 437 A.2d at 1138. The Supreme Court has interpreted this exception to the general requirement of expert testimony to be applicable "where the matter is so simple or the lack of skill or care is so obvious as to be within the range of experience and comprehension of even nonprofessional persons." *Hightower–Warren v. Silk, supra* at 463 n. 1, 698 A.2d at 54 n. 1.

■ ¶ 6 The doctrine of *res ipsa loquitur* "allows a jury to infer the existence of negligence and causation where the injury at issue is one that does not ordinarily occur in the absence of negligence." *Sedlitsky v. Pareso,* 400 Pa.Super. 1, 582 A.2d 1314, 1315 (1990), *appeal denied,* 527 Pa. 673, 594 A.2d 659 (1991). Under the Restatement (Second) of Torts § 328D(1), three elements are required to establish the applicability of the doctrine: "(a) the event is of a kind which usually does not occur in the absence of negligence; (b) other responsible causes, including the conduct of the plaintiff and third persons, are sufficiently eliminated by the evidence; and (c) the indicated negligence is within the scope of the defendant's duty to the plaintiff." If a plaintiff has established all three elements and "reasonable persons may reach different conclusion[s] regarding the negligence of the defendant, then it is for the jury to determine if the inference of negligence should be drawn." *Leone v. Thomas,* 428 Pa.Super. 217, 630 A.2d 900, 901 (1993), *appeal denied,* 537 Pa. 664, 644 A.2d 1201 (1994).

■ ¶ 7 The Supreme Court, in *Hightower–Warren v. Silk, supra,* reversed and remanded for trial after concluding that this Court had erred in affirming the entry of a compulsory non-suit against the plaintiff. The Supreme Court found that the plaintiff had presented sufficient evidence to establish "all three elements of *res ipsa loquitur*", *id.* at 465, 698 A.2d at 55, where the evidence produced at trial by the plaintiff indicated that: (1) the injury to the left recurrent laryngeal nerve was the kind of event that does not occur in the absence of negligence under the operative conditions described by the defendant, (2) the plaintiff's treating physician was able to rule out all other causes of the injury, and (3) the indicated negligence was within the defendant's duty to the plaintiff.[3]

■ ¶ 8 In the instant case, the trial court properly permitted appellee to proceed on a theory of *res ipsa loquitur* where the evidence produced by appellee indicated that he went to the Pain Center for a cortisone injection for muscle pain in his back and, upon injection by Dr. Stone, immediately suffered severe pain and an inability to breath and, after collapsing a few hours later, was immediately diagnosed in the emergency room of a local hospital with a collapsed lung.

¶ 9 In *Killingsworth v. Poon,* 167 Ga. App. 653, 307 S.E.2d 123 (1983), a case bearing striking similarities to the instant action, the Georgia Court of Appeals found that the doctrine of *res ipsa loquitur* was applicable where the plaintiff "visited the office of [the defendant], complaining of pain 'from a pulled muscle in [her] shoulder'. Immediately after [the defendant] injected two needles in [plaintiff's] upper back in treatment of the muscular problem, for the first time [plaintiff] developed a problem in her chest when she 'began experiencing extreme pain and breathing difficulties ... [so that she] almost fainted right after [the defendant] performed the

---

**3.** " '[I]t is within the scope of [a physician's] duty of care to protect his patient against preventable injuries which could reasonably occur during the performance of surgery.' " *Hightower–Warren v. Silk,* 548 Pa. 459, 466 n. 7, 698 A.2d 52, 55 n. 7, quoting *Sedlitsky v. Pareso,* 400 Pa.Super. 1, 582 A.2d 1314, 1317 (1990), *appeal denied,* 527 Pa. 673, 594 A.2d 659 (1991).

injection.' The following day [plaintiff] was diagnosed as having a punctured and collapsed lung and was required to obtain treatment for this condition at a hospital." *Id.* at 126. The Georgia Court of Appeals held that "it appears on the record before us in the instant case that it 'is a matter of common knowledge and observation that such things do not ordinarily attend the service of one possessing ordinary skill and experience in the delicate work of [medical procedures]. **It does not need scientific knowledge or training to understand that, ordinarily speaking, such results are unnecessary, and are not to be anticipated if reasonable care can be exercised by the operator....'"** *Id.* at 126–27 (citation omitted) (emphasis added). Similarly, the Supreme Court of California in *Bardessono v. Michels,* 3 Cal.3d 780, 91 Cal.Rptr. 760, 478 P.2d 480, (1970), held that, where the plaintiff claimed a paralysis and atrophy of his shoulder muscles as a result of an injection of cortisone to relieve muscle pain, an instruction on *res ipsa loquitur* was proper since there was "sufficient common knowledge and observation among laymen, regardless of expert testimony, to indicate 'that the consequences of the professional treatment were not such as ordinarily would have followed if due care had been exercised' so as to raise an inference of negligence." *Id.* at 789, 91 Cal.Rptr. 760, 478 P.2d at 485, quoting *Cavero v. Franklin General Benevolent Society,* 36 Cal.2d 301, 309, 223 P.2d 471, 476 (1950).

¶ 10 The *Bardessono* Court noted that:

4. The claim that Dr. Dellevigne was not competent to testify as to the cause of the pneumothorax is wholly meritless and may be summarily rejected. *See: e.g., Miller v. Brass Rail Tavern, Inc.,* 541 Pa. 474, 480–81, 664 A.2d 525, 528 (1995); *Chanthavong v. Tran,* 452 Pa.Super. 378, 682 A.2d 334, 338 (1996).

5. We note that the Supreme Court in *Miller v. Brass Rail Tavern, Inc., supra,* specifically rejected the claim that "the sanction authorized by Rule 4003.5 is obligatory," holding that

Hardly a man, woman or child (even those of tender age) exists in this country who has not had injections of one kind or another.... So the giving and receiving of injections and the lack of nerve injury therefrom ordinarily has become a matter of common knowledge. **If something does go wrong, it is a matter for explanation by the person causing the injury.** *Id.* at 791, 91 Cal.Rptr. 760, 478 P.2d at 486–87 (emphasis supplied). We agree and thus reject the claim that the trial court erred when it issued a *res ipsa loquitur* instruction to the jury in the instant case. *See also: Baker v. Chastain,* 389 So.2d 932 (Ala.1980); *Stumph v. Foster,* 524 N.E.2d 812 (Ind.App.1988).

■ ¶ 11 Appellants next contend that the trial court committed reversible error when it permitted Dr. Dellevigne, who appeared as a fact witness, to testify on the issue of causation, due to the failure of appellee to timely provide a pretrial expert report describing his proposed testimony. Appellants also contend that Dr. Dellevigne, a board certified general surgeon, was not competent to testify as to causation.[4]

¶ 12 Appellants sought to preclude Dr. Dellevigne from offering any expert testimony at trial on the grounds that Dr. Dellevigne "a treating physician, who is not being presented [as] an expert, cannot opine as to any issue at hand in the instant matter, including causation,.... Pa. R.C.P. 4003.5(b) provides that, if the identity of an expert witness is not disclosed during discovery, he shall not be permitted to testify at the time of trial."[5]

... when a discovery violation occurs as a result of a failure to identify an expert witness, "the presiding court must balance the facts and circumstances of each case to determine the prejudice to each party." *[Feingold v. SEPTA,* 512 Pa. 567] at 573, 517 A.2d [1270] at 1273 [ (1986) ]. We outlined the basic considerations a trial court should review as follows:
(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to

¶ 13 The trial court denied the motion *in limine* and permitted Dr. Dellevigne to testify that the pneumothorax was caused by the injection administered at the Pain Center. As the trial court correctly noted, Dr. Dellevigne did not testify as to the applicable standard of care and the challenged testimony on causation could not possibly have surprised or prejudiced appellants, who did not offer any evidence at trial to contest the fact that the pneumothorax was caused by the injection.[6]

¶ 14 The medical records of appellee were timely supplied during discovery, and both the discharge summary authored by Dr. Dellevigne and the Chester County Hospital Emergency Department records indicate that immediately after a steroid injection to the right shoulder/ribcage area administered at the Pain Center, appellee experienced pain and shortness of breath which continued to increase until he arrived at Chester County Hospital. The deposition of Dr. Dellevigne was taken on April 2, 1998, more than six months prior to trial. Thus, the identity of Dr. Dellevigne and the content of his testimony were timely provided to appellants during discovery, precluding any claim of prejudice.

¶ 15 Moreover, as we have noted, the claim of appellants that Pennsylvania Rule of Civil Procedure 4003.5 was violated is wholly meritless. Our Supreme Court in *Miller v. Brass Rail Tavern, Inc.*, 541 Pa. 474, 664 A.2d 525 (1995), specifically held that the provisions of Rule 4003.5 were

inapplicable where the expert's opinions "were not acquired or developed with an eye toward litigation." *Id.* at 487, 664 A.2d at 531–32. *See also: Neal by Neal v. Lu*, 365 Pa.Super. 464, 530 A.2d 103, 108 (1987). Dr. Dellevigne was the physician who treated the appellee in the emergency room and ICU of Chester County Hospital, long before the instant action was contemplated or instituted. As the observations and conclusions of Dr. Dellevigne were not acquired or developed in anticipation of trial, Rule 4003.5 is not applicable to him. *See: Miller v. Brass Rail Tavern, Inc., supra* at 486–87, 664 A.2d at 531; *Neal by Neal v. Lu, supra; Harasimowicz v. McAllister*, 78 F.R.D. 319, 320 (E.D.Pa. 1978). Thus, the trial court properly permitted Dr. Dellevigne to testify as to the cause of the pneumothorax.

∎ ¶ 16 Appellants next argue that the trial court erred when it rejected the argument that the dismissal of Dr. Stone, the agent or apparent agent of Dr. Rogal, extinguished any claim based on vicarious liability against Dr. Stone's principal, Dr. Rogal, summary judgment[7] having been entered in favor of the estate of Dr. Stone on September 2, 1997, based on the application of the Dead Man's Act.[8] *See:* 42 Pa.C.S. § 5930.

¶ 17 Appellants, based on their reading of the opinion of the Supreme Court in *Mamalis v. Atlas Van Lines, Inc.*, 522 Pa. 214, 560 A.2d 1380 (1989), contend that because the claim of appellee Toogood against Dr. Stone was effectively preclud-

which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or willfulness in failing to comply with the court's order. *Id.* at 574, 517 A.2d at 1273 (quoting *Feingold v.. SEPTA*, 339 Pa.Super. 15, 21, 488 A.2d 284, 287 (1985)).
*Miller v. Brass Rail Tavern, Inc., supra* at 488 n. 5, 664 A.2d at 532 n. 5.

**6.** We note that "this is a case in which the injury 'is so immediately and directly, or naturally and probably, the result of the accident that the connection between them does not depend solely on the testimony of professional

or expert witnesses.' " *Matthews v. Clarion Hospital*, 742 A.2d 1111, 1116 (Pa.Super.1999) quoting *Tabuteau v. London Guarantee and Accident Co., Ltd. .*, 351 Pa. 183, 185–87, 40 A.2d 396, 398 (1945).

**7.** Summary judgment was requested and entered in favor of the estate of Dr. Stone as to the claims of appellee Toogood only. The cross-claim of the Rogal appellants remains.

**8.** No claim of error based on the entry of summary judgment in favor of Dr. Stone has been presented in this appeal.

ed by the ruling of the trial court on the Dead Man's Act, recovery against the Rogal appellants under principles of vicarious liability is also precluded. This argument equates a valid defense of immunity with the defense of release and satisfaction and evidences a profound misapprehension of the nature of the vicarious liability of a principal for the tortious acts of his agent.

¶ 18 Generally, a cause of action for which recovery is sought in a lawsuit is based upon a single tortious act. In the instant case, that single tortious act was the injection administered by Dr. Stone, the apparent employee of Dr. Rogal and the Pain Center. Appellee had the right to pursue a recovery against the tortfeasor, Dr. Stone, or against his principal, the Rogal appellants, or to join both of them in a single action. As our Supreme Court observed in *Rivera v. Philadelphia Theological Seminary of St. Charles Borromeo, Inc.*, 510 Pa. 1, 22, 507 A.2d 1, 11–12 (1986), "[w]hen one defendant's tort liability is vicariously based on *respondeat superior*, the other parties **are not initially required to pursue their rights of recovery,** contribution or indemnification **from the servant** whose operative negligence led to the plaintiff's injury by joining that servant." (emphasis supplied). *Accord: Restifo v. City of Philadelphia*, 151 Pa.

Cmwlth. 27, 617 A.2d 818, 820–21 (1992). The only limitation on the right of appellee to institute suit was that appellee was entitled to only **one** recovery from **either** the principal (the Rogal appellants) **or** the agent (Dr. Stone). In this case, appellee obtained only a single recovery from the principal based on the tortious act of the agent, Dr. Stone.[9]

¶ 19 In the case relied upon by appellants, *Mamalis v. Atlas Van Lines, Inc., supra*, the Pennsylvania Supreme Court held that an agent and his or her principal are **not** joint tortfeasors and, thus, the change of the common law rule effected by the adoption of the Uniform Contribution Among Tortfeasors Act (UCATA) is not applicable in resolving the issue of whether the release of an agent causes the derivative claim against the principal to be extinguished. *Mamalis* is of limited value in resolving the instant controversy, however, since in *Mamalis*, the plaintiff accepted a settlement from the agent and tendered a release to the agent. Thus, having obtained a recovery from the agent, the entire claim was extinguished.[10]

¶ 20 The situation presented in this case is more akin to that presented in *Rivera v. Philadelphia Theological Seminary, supra*. In *Rivera*, a boy drowned in a pool owned by the Diocese of Philadelphia,

---

9. *See: Restifo v. City of Philadelphia*, 151 Pa. Cmwlth. 27, 617 A.2d 818, 820–21, 821 n. 1 (1992).

10. The purpose of the general rule that "termination of the claim against the agent extinguishes the derivative claim against the principal", *Mamalis v. Atlas Van Lines*, 522 Pa. 214, 221, 560 A.2d 1380, 1383, is to prevent a plaintiff from obtaining a double recovery for a single injury:

> ... The tort committed by the servant is the same tort for which the master is liable under the doctrine of imputed negligence. Damages recovered for such a tort are entire and not severable. The servant is liable to his master for damages which the master has been compelled to pay to third persons because of the negligent or other wrongful act of the servant, where the master is not himself at fault. For the above reasons it

has been held that, despite the fact the master and servant are not joint tortfeasors, a release to one discharges the other. If that were not the case, we might have a situation where a party would settle with the master, then sue and [recover] against the servant, who would then be liable in a suit brought against him by the master, thus forcing him to pay twice for the one wrong.

*Gavin v. Malherbe*, 146 Misc. 51, 261 N.Y.S. 373, 375–76 (N.Y.Sup.Ct.1932), *aff'd.*, 240 A.D. 779, 266 N.Y.S. 897 (2d Dep't 1933), *aff'd.*, 264 N.Y. 403, 191 N.E. 486 (N.Y.Ct. App.1934). *Accord: Blum v. Goldman*, 366 Pa. 527, 79 A.2d 248 (1951). *See also: Restifo v. City of Philadelphia, supra* (expiration of statute of limitations prior to institution of suit against primarily liable homeowner did not bar action against secondarily liable city, which had a right of indemnity against homeowners.)

while being chaperoned by a diocese employee, Father Flynn. The Supreme Court held that the entry of a directed verdict by the trial court in favor of the servant, Father Flynn, was not an impediment to a verdict against his principal, the Diocese:

> ... it is not necessary to reinstate Father Flynn as a party defendant in order to fairly resolve the outstanding issues among the other parties. When one defendant's tort liability is vicariously based on *repondeat superior*, the other parties are not initially required to pursue their rights of recovery, contribution or indemnification from the servant whose operative negligence led to the plaintiff's injury by joining the servant.

*Id.* at 21–22, 507 A.2d at 11–12.

¶ 21 Thus, the inability of Mr. Toogood to present testimony directly against Dr. Stone as a result of the ruling of the trial court based on the Dead Man's Act, 42 Pa.C.S. § 5930, had no effect on the ability of Mr. Toogood to proceed against Dr. Stone's principal. Nor will the inability of Mr. Toogood to present testimony against Dr. Stone be of any relevance in the indemnity action of the Rogal appellants against Dr. Stone.

■ ¶ 22 In their final argument, appellants contend that the trial court erred when it failed to issue a substantial remittitur, and when it refused to mold the verdict to reflect the right of appellants to indemnification from Dr. Stone where the verdict against appellants was premised solely on vicarious liability.

¶ 23 In *Tulewicz v. Southeastern Pennsylvania Transportation Authority*, 529 Pa. 584, 606 A.2d 425 (1991), our Supreme Court articulated the standard for setting aside a verdict as excessive:

> The Court is not warranted in setting aside, reducing, or modifying verdicts for personal injuries unless unfairness, mistake, partiality, prejudice, or corruption is shown, or the damages appear to be grossly exorbitant. The verdict must be clearly and immoderately excessive to justify the granting of a new trial. The amount must not only be greater than that which the court would have awarded, but so excessive as to offend the conscience and judgment of the Court.

*Id.* at 586, 606 A.2d at 426, quoting *Stark v. Lehigh Foundries*, 388 Pa. 1, 23, 130 A.2d 123, 135 (1957). We cannot, on the basis of the record before this Court, which includes the testimony [11] of appellee regarding the pain he suffered, find that the trial court erred when it declined to issue a remittitur.

■ ¶ 24 Nor can we find that the trial court abused the considerable discretion vested in it when it severed the indemnity claim for resolution after the trial in the instant case. The trial court has not addressed this claim in the 1925(b) opinion submitted to this Court presumably as a result of the failure of the Rogal appellants to separately identify this claim as an issue to be addressed on appeal.[12] Appellants have not suffered any prejudice as a result of the decision of the trial court not to rule

11. Appellee testified that he was in great pain and feared that he would die. Specifically, appellee testified that, immediately after he received the shot on December 13, 1993, "I felt a pain coming across my chest. And it was excruciating pain I was feeling and I said to the doctor, 'I never felt anything like this before, having a shot.'" Appellee went on to testify that he had to remain awake while Dr. Dellevigne made an incision and attempted to insert a tube into his chest. Appellee testified that during this procedure, "a bunch of blood came out," and that "I felt like I was going to die. I told my mom that I loved her." Appellee lost four and a half pints and remained in the intensive care unit for 36 hours. Appel-

lee's relatives underwent blood testing in case appellee would need a donation. The scar from this incident still remains, and appellee sees it "every time [he gets] out of the shower, brush[es his] teeth, shave[s], blow dr[ies his] hair."

12. Appellant recounts in Issue No. 5 of his 1925 statement thirteen lines of introductory argument before reciting, "The Honorable Court erred in failing to rule that the dismissal of Dr. Stone discharged the vicarious liability and ostensible agency claims against Dr. Rogal, the ostensible principal. *Mamalis v. Atlas Van Lines Inc.*, 522 Pa. 214, 560 A.2d

on the indemnity claim, *Bianculli v. Turner Construction Co.*, 433 Pa.Super. 237, 640 A.2d 461, 465 (1994), *appeal denied*, 539 Pa. 655, 651 A.2d 541 (1994), and may resolve the outstanding claim before the trial court on remand. *See: Moran for and on Behalf of Estate of Moran v. G. & W.H. Corson, Inc.*, 402 Pa.Super. 101, 586 A.2d 416, 428 (1991) (*en banc*), *appeal denied*, 529 Pa. 650, 602 A.2d 860 (1992).

¶ 25 Thus, as the issues raised by the Rogal appellants are without merit, we affirm the judgment entered in favor of appellee at appeal No. 1561 EDA 1999.

### Appeal at No. 1562 EDA 1999

¶ 26 The issues raised by appellant Stone in support of his request for judgment n.o.v. or a new trial have been addressed and rejected in the appeal at No. 1561 EDA 1999. We, therefore, affirm the judgment entered in favor of appellee at appeal No. 1562 EDA 1999.

¶ 27 Judgment affirmed.

1380 (1989). Dr. Rogal is entitled, as a matter of law, to have the verdict molded in his favor and against co-defendant Stone, against whom Dr. Rogal cross-claimed." While appellants did include at the end of the last paragraph of issue 5, a sentence raising the failure of the court to rule on the indemnity issue, the trial court, understandably, did not discover the claim.