Robert D. MANION, Plaintiff,

v.

N.P.W. MEDICAL CENTER OF N.E. PENNSYLVANIA, INC., S. David Weisbaum, M.D. and A.F. D'Anca, M.D., Defendants.

Civ. No. 86–0717.

United States District Court,
M.D. Pennsylvania.

Dec. 8, 1987.

Thomas J. Foley, Jr., Thomas J. Foley, Jr. and Associates, P.C., Scranton, Pa., for plaintiff Robert D. Manion.

Irwin Schneider, Timothy J. Holland, Paul A. Barrett, O'Malley, Harris & Schneider, P.C., Scranton, Pa., for N.P.W. Medical Center of N.E. Pennsylvania, Inc.

Peter J. Curry, Melinda S. Schoop, Thomas & Thomas, Harrisburg, Pa., for defendant S. David Weisbaum, M.D.

Joseph A. Quinn, Jr., Hourigan, Kluger, Spohrer, Quinn & Myers, Wilkes–Barre, Pa., for defendant A.F. D'Anca, M.D.

MEMORANDUM AND ORDER

NEALON, Chief Judge.

By way of a brief factual introduction, plaintiff, Robert D. Manion, was injured in

a fall in July 1984 and was transported to defendant N.P.W. Medical Center for emergency medical assistance. X-rays were taken by hospital personnel and were interpreted by a radiologist, defendant S. David Weisbaum, M.D. Plaintiff was treated by defendant A.F. D'Anca, M.D., for fractures of the left clavicle and scapula and was thereafter released.

Approximately two weeks later, plaintiff, upon the advice of his family physician, was admitted into Mercy Hospital, Wilkes Barre, where he was treated by Victor T. Ambruso, M.D., and Yu–Song Kao, M.D. It was determined at this time that plaintiff had a fracture dislocation of his cervical spine at the C6–7 level. Surgery was performed by Dr. Ambruso.

After the initiation of this negligence action against N.P.W., Dr. Weisbaum and Dr. D'Anca, counsel for defendant D'Anca *ex parte* communicated with plaintiff's subsequent treating physicians, Drs. Ambruso and Kao, without notifying plaintiff or his counsel. Ambruso and Kao were subsequently listed as expert witnesses for the defendants. Plaintiff's counsel filed a motion in limine seeking to preclude defense counsel both from making further unauthorized *ex parte* contacts with plaintiff's former treating physicians and from calling those physicians as expert witnesses at trial.

At a pretrial conference held on December 3, 1987, plaintiff's counsel disclosed that he would voluntarily dismiss the action against Drs. Weisbaum and D'Anca and would proceed only against N.P.W. Inasmuch as counsel for N.P.W. indicated at the pretrial conference that he would attempt to conduct *ex parte* interviews with Drs. Ambruso and Kao and that, as noted in his pretrial memorandum, he expected to call these former treating physicians as expert witnesses at trial, plaintiff's motion in limine still must be addressed.

For the reasons set forth below, the motion in limine will be granted.

## FACTS

On July 1, 1984, plaintiff fell down a flight of stairs and was transported to N.P.W. Medical Center where he was examined by emergency room physicians. At N.P.W., plaintiff's neck, left shoulder and chest were x-rayed by hospital personnel, and those x-rays were later interpreted by Dr. Weisbaum. Dr. D'Anca was then called in to treat plaintiff for fractures of the left clavicle and scapula. Specifically, a figure-eight bandage and a sling were applied to plaintiff's left shoulder and arm.

Plaintiff was released from N.P.W. with instructions to contact D'Anca within a few days. After conferring with his family doctor about, *inter alia*, his persistent pain, plaintiff again consulted D'Anca on July 5, 1984. D'Anca took further x-rays, but the court has not been provided with any information indicating the nature or scope of these x-rays. After examining plaintiff, D'Anca directed him to return in fifteen days.

Plaintiff continued to experience pain, and on July 9, 1984, upon the advice of his family doctor, he was admitted into Mercy Hospital, Wilkes–Barre, where he was treated by Drs. Ambruso and Kao. Additional x-rays revealed a fracture dislocation of the cervical spine at the C6–7 level. On July 13, 1984, Ambruso performed an anterior cervical discectomy and fusion at the C6–7 level.

The present case was commenced on May 23, 1986. In his complaint, plaintiff claimed injuries allegedly resulting from, or exacerbated by, the delay in diagnosing and treating his spinal fracture; he asserted, *inter alia*, that defendants either failed to properly x-ray his cervical spine or failed to properly read their x-rays of that area. Defendants, on the other hand, have maintained that the x-rays of plaintiff's cervical spine were properly taken, that said x-rays do not reveal any abnormality and that plaintiff's injuries were not caused by the delay in diagnosing and treating his spinal fracture.

By letter dated February 25, 1986, some ten and a half months prior to his interview with defense counsel, Dr. Ambruso informed plaintiff's counsel that the "C7 was not adequately visualized in the cervical

spine x-rays taken at N.P.W. after plaintiff's fall." *See* Exhibit "E" attached to document 58 of the record. Dr. Ambruso added, "Because of this I suspect [plaintiff's] subluxation was missed." *Id.* The physician concluded, "I would suspect that part of the persistence of [plaintiff's symptoms] ... could be attributed to the fact there was a delay between diagnoses and subsequent treatment via anterior cervical fusion. My feeling is the C7 vertebrae should have been more adequately visualized at the time of his [initial] exami[n]ation." *Id.* The doctor also invited plaintiff's counsel to contact him for further assistance if necessary.

It is undisputed that counsel for Dr. D'Anca, accompanied by Dr. D'Anca, conducted an *ex parte* interview with Dr. Ambruso on January 17, 1987 without providing advance notice to plaintiff or his counsel. On January 28, 1987, Ambruso wrote to D'Anca's counsel, opining on this occasion that the cervical spine x-rays taken at N.P.W. adequately visualized the C6–7 level and showed no fracture, that D'Anca's treatment was appropriate and that the delay in diagnosing and treating the spinal fracture did not contribute to plaintiff's injuries in any manner.[1] As previously noted, counsel for Dr. D'Anca subsequently informed plaintiff's counsel that Dr. Ambruso would appear at trial as an expert witness on behalf of D'Anca. Plaintiff's counsel submitted an affidavit representing that he, through his secretary, attempted to reach Ambruso by telephone on numerous occasions in March and August of 1987. Plaintiff's counsel was advised by the physician's staff that, notwithstanding Ambruso's willingness on February 25, 1986 to provide him with further assistance

if necessary, the physician now refused to meet with him.

It is further undisputed that counsel for Dr. D'Anca *ex parte* contacted Dr. Kao by telephone on January 6, 1987 and by letter dated January 30, 1987 without prior notice to plaintiff or his counsel. By letter to D'Anca's counsel dated June 30, 1987, Kao concluded that "the cervical spine films available to Dr. D'Anca on [July 1, 1984] were non-diagnostic of any cervical injury...." *See* Exhibit "B" attached to document 58.[2] Dr. Kao was likewise listed as an expert witness who would testify at trial on behalf of the defense. Plaintiff's counsel represents that Kao has likewise failed to return several telephone calls which counsel placed to the physician's office in April and August of 1987.

Plaintiff filed the motion in limine on October 15, 1987. He seeks an order restraining defense counsel from engaging in further *ex parte* contacts with plaintiff's past or present treating physicians without plaintiff's prior authorization. He also requests that defendants be prohibited from calling Ambruso, Kao or any other treating physician as an expert witness at trial. The parties have thoroughly briefed the present dispute, and the court heard oral argument in chambers on November 23, 1987 and December 3, 1987.

Plaintiff's motion in limine is now ripe for disposition. The primary issue for the court's consideration is whether defense counsel in a medical malpractice case may contact, *ex parte*, a plaintiff's former treating physician.

## LEGAL PRECEDENT

Several Pennsylvania trial courts have inquired into the propriety of unauthorized

---

1. Counsel for Dr. D'Anca informed the court that at the request of Dr. Ambruso's insurance carrier, he represented Ambruso in past medical malpractice actions instituted against this physician. Further, D'Anca's counsel indicated that he compensated Ambruso for both the January 17, 1987 meeting and the subsequent medical report.

Counsel for Dr. D'Anca explains Dr. Ambruso's apparent shift in views by pointing out that Ambruso had reviewed only Weisbaum's radiological report when writing to plaintiff's counsel

on February 25, 1986 and that Ambruso first saw the initial x-rays of plaintiff (*i.e.,* those taken at N.P.W. on July 1, 1984) during the January 17, 1987 meeting with D'Anca and his counsel.

2. At the request of Dr. Kao's insurance carrier, counsel for Dr. D'Anca represented Kao in past medical malpractice actions instituted against this physician. The court has not been informed whether Kao was compensated for his services by D'Anca's counsel.

*ex parte* contacts between defense counsel and a plaintiff's treating physician. Since no Pennsylvania appellate court has ever addressed this subject, this court will also examine relevant decisions from outside of Pennsylvania in an attempt to gauge how the Pennsylvania Supreme Court would rule on this question.[3]

### I. Pennsylvania Cases

A series of cases condemning unauthorized *ex parte* contacts has emanated out of Pennsylvania's lower courts. The seminal case is *Alexander v. Knight*, 25 Pa.D. & C. 2d 649 (C.P.Phil.Cty.1961), *aff'd per curiam*, 197 Pa.Super. 79, 177 A.2d 142 (1962). In that decision, the court ordered a new trial on the basis of the jury's low monetary award. A side issue which bothered the court was that a representative of defense counsel, a physician, had contacted one of the plaintiff's treating physicians and had obtained a report from the doctor which was favorable to the defendant. The court in *Alexander* remarked:

> We do not consider the ... matter as significant in this case, but we deem it advisable to briefly refer to our view of this incident. We are of the opinion that members of a profession, especially the medical profession, stand in a confidential or fiduciary capacity as to their patients. They owe their patients more than just medical care for which payment is exacted; there is a duty of total care; that includes and comprehends a duty to aid the patient in litigation, to render reports when necessary and to attend court when needed. That further includes a duty to refuse affirmative assistance to the patient's antagonist in litigation. The doctor, of course, owes a duty to conscience to speak the truth; he need, however, speak only at the proper time. [The defense representative's] role in inducing [the treating physician's] breach of his confidential relationship to his own patient is to be and is condemned.[4]

177 A.2d at 146. The *Alexander* court did not cite any authority for its comments, but its language is clear and unequivocal.

The first case to follow the *Alexander* reasoning was *Shea v. McCadden*, 46 Pa.D. & C. 2d 560 (C.P.Del.Cty.1969). The plaintiff claimed psychological damage as the result of an accident, and the defendants sought to have the plaintiff examined by a psychiatrist who had treated the plaintiff prior to the accident but who was in the employ of the defendants for purposes of the pending litigation. The plaintiff refused to submit to the examination, and the defendants countered with a petition for a rule to show cause upon the plaintiff why she should not be ordered to submit to their request. Focusing upon the "confidential relationship" between a patient and his physician, the *Shea* court dismissed the petition for a rule to show cause and stated:

> Our concern is defendants' employment of [the psychiatrist] to now examine plaintiff, with his prior accumulated knowledge gained at a time when plaintiff reposed the fullest trust in his ability, integrity, and confidence, and which trust, we note, is absolutely essential to the relationship of patient and doctor, if the doctor is to function at the most salutary level to apply his healing skills for the patient's benefit. With this, the physician's hand should have been stayed, out of duty to his professional posture.

46 Pa.D. & C.2d at 562. The court concluded, "To allow this physician to conduct this examination would be to give legal sanction to a breach of the confidential relationship between patient and doctor." *Id.* at 563.

In *Nicholson v. Polcyn Estate*, 12 Pa.D. & C.3d 561 (C.P.Lanc.Cty.1979), the court ruled that a patient may maintain an action against his physician for disclosing confidential information without permission. Citing the *Alexander* opinion, the *Nichol-*

---

3. Under F.R.E. 501, the existence and scope of privileges is governed by state law, and all counsel agree that Pennsylvania law applies in this instance.

4. This court similarly emphasizes that the physician's overriding duty is always to tell the truth, even if his comments *de facto* aid his patient's adversary in litigation.

*son* court stated, "[T]his court holds that a physician has a legal duty to maintain confidentiality of information arising from the physician-patient relationship unless compelled to testify during litigation." 12 Pa. D. & C.3d at 569.

The next decision in the line of cases proscribing unauthorized *ex parte* contacts is *Freyer v. The Travelers Indemnity Co.,* 15 Pa.D. & C.3d 649 (C.P. Westmoreland Cty.1980).[5] The defendant sought to have the plaintiff, who was injured in an automobile accident, examined by a physician who had previously treated the plaintiff for injuries stemming from the same accident. The plaintiff refused the defendant's request, and the court *en banc* denied the defendant's motion to compel the plaintiff to appear for a physical examination. The *Freyer* court explained:

> Defendant ... proposes to have plaintiff's treating physician now examine, reevaluate and report on plaintiff's condition. The physician would now be acting in the capacity of an expert witness for hire, and actively representing the interest of his employer, defendant-insurance carrier. Such action would have a "chilling" effect on all potential patients. A patient would realize that his treating physician could be called upon to "sell" to a defendant-insurance company either privileged or non-privileged information given by the patient (plaintiff) to the physician. Further, the physician would be in a position to utilize all information gained in his capacity as "treating physician" to orchestrate a defense on behalf of the defendant-insurance carrier.

15 Pa.D. & C.3d at 651. The court believed that by denying the motion to compel a physical examination, it "properly relieved any potential ethical burden on plaintiff's physician, and avoided any 'chilling' effect on any potential patient." *Id.* at 652.

A detailed treatment of the *ex parte* issue is provided in *Hoffmeyer v. Pell,* 23 Pa.D. & C.3d 448 (C.P. Somerset Cty.1982). In this medical malpractice action, the plaintiff's counsel refused to permit de-fense counsel to discuss the case with one of the plaintiff's treating doctors. The *Hoffmeyer* court declined to authorize defense counsel to speak with the treating physician, holding that "[f]ormal discovery on the record, after notice to and opportunity to other parties to be present and to participate in the proceedings, is by far the fairest and most satisfactory means of discovery...." 23 Pa.D. & C.3d at 455. The court emphasized:

> In a formal deposition ... the presence of a patient's counsel and the availability of protective orders ... assure that clearly irrelevant medical testimony will not be elicited. Private, nonadversary interviews by adverse counsel would offer no such protection to the patient's right of privacy. The presence of the patient's counsel at the doctor's interrogation permits the patient to know what his doctor's testimony is, allays a patient's fears that his doctor may be disclosing personal confidences, and thus helps preserve the complete trust between doctor and patient which is essential to the successful treatment of the patient's condition.
>
> The presence of the patient's attorney during the doctor's examination also helps protect the doctor from unwittingly and improperly disclosing medical information about his patient.

*Id.* at 453–54 (quoting *Wenninger v. Muesing,* 307 Minn. 405, 240 N.W.2d 333, 336–37 (1976)).

The latest opinion in the *Alexander* line of cases is *McNally v. Easton Hospital,* 46 Northampton Rep. 202 (1985). The plaintiffs in this medical malpractice action filed a motion to prevent the defendants from conducting an *ex parte* interview with the plaintiffs' treating physician and from retaining the treating physician as an expert on the defendants' behalf. Citing the *Alexander, Hoffmeyer* and *Shea* decisions, the court in *McNally* remarked, "Other trial courts in the Commonwealth have recognized the existence of [a] duty of a physician to his patient and have prevented dis-

---

**5.** Curiously, the court in *Freyer* did not cite the *Alexander, Shea* or *Nicholson* opinions and treated the circumstances before it as a case of first impression.

closures or contact between plaintiff's physician and counsel for a defendant.... [T]his court must take cognizance of the strong condemnation in this Commonwealth [of unauthorized *ex parte* communications] between treating physicians and the defense set forth in *Alexander v. Knight*." 46 Northampton Rep. at 204–05. The *McNally* court then added:

> Based on the duty of 'total care,' including the affirmative duty to aid in litigation set forth in *Alexander*, Plaintiffs should be able to prevent contact between [the treating physician] and counsel for Defendants in the manner of an *ex parte* interview with the possibility of retaining him as an expert witness. Although [the treating physician] would freely speak with Defendants or their counsel, we believe that the Plaintiffs, as representatives of the patient, and as the patient of [the treating physician], have the right to object when the possibility exists that this affirmative duty will be breached by contact with the defense. The affirmative duty to aid in litigation discussed in *Alexander* ... is designed to protect the patient. Therefore, the patient should be able to avail himself of its protection.

*Id.* at 205. The court noted that defense counsel was not precluded from all types of contact with the treating physician and could utilize formal discovery procedures to interrogate the doctor. Finally, the court pointed out that the defendants were in effect precluded from using the treating physician as an expert witness because the *Alexander* reasoning discouraged contacts between defense counsel and a treating physician where the plaintiff's counsel is not present. Consequently, the court issued a restraining order prohibiting defense counsel from contacting the treating physician by way of an unauthorized *ex parte* interview and further prohibiting defense counsel from retaining the treating physician as an expert witness.

One Pennsylvania decision, *Rost v. Kraus*, Civil No. 83–00144, slip op. (Lycoming Cty. Mar. 20, 1985), expressly rejected the idea that the confidential relationship between a physician and his patient bars unauthorized *ex parte* meetings between the physician and his patient's adversary in litigation. In direct contrast to *Alexander* and its progeny, the *Rost* court ruled that the statutory physician-patient privilege, 42 Pa.C.S.A. § 5929, is the only privilege which a person enjoys by virtue of his status as a patient.[6] The court reasoned:

> Section 5929 applies to the general disclosure of information rather than the limited area of testimony. However, the plaintiff contends that a physician owes to his patient an additional and distinct duty not to assist counsel opposing the patient in litigation, by, for example, giving a unilateral interview to opposing counsel. We disagree. The court finds that the case law cited by the plaintiff does not establish such a separate physician-patient duty or privilege. Rather, we agree with the defendants that § 5929 affords the sole and exclusive physician-patient privilege in Pennsylvania. To the extent that the *dicta* in *Alexander v. Knight* is contrary to our conclusion, we respectfully disagree that such a view of the physician's duty would preclude the admission of testimony sought by the defendants in this case. To rule otherwise would severely limit the defendants, as well as the trier of fact, from exploring facts necessary to the appropriate resolution of this case.

**6.** The statutory physician-patient privilege listed at 42 Pa.C.S.A. § 5929 reads as follows:

No physician shall be allowed, in any civil matter, to disclose any information which he acquired in attending the patient in a professional capacity, and which was necessary to enable him to act in that capacity, which shall tend to blacken the character of the patient, without consent of said patient, except in civil matters brought by such patient, for damages on account of personal injuries.

As discussed *infra,* the statutory physician-patient privilege is completely separate and distinct from the public policy prohibition against unauthorized *ex parte* communications with a plaintiff's treating physician. For example, while the former is waived by the initiation of a lawsuit, the latter is not, and while the former governs what information is subject to discovery, the latter regulates only the means of discovery.

Slip op. at 5. The court in *Rost,* then, approved *ex parte* interviews of treating physicians by defense counsel.

## II. Non–Pennsylvania Cases

Cases outside of Pennsylvania have reached varying conclusions on the question of whether defense counsel may make unauthorized *ex parte* contacts with a plaintiff's treating physician. A recent case proscribing such communications is *Petrillo v. Syntex Laboratories, Inc.,* 148 Ill.App.3d 581, 102 Ill.Dec. 172, 499 N.E.2d 952 (1986). Prior to trial, defense counsel informed the trial court that he had participated in an unauthorized *ex parte* conference with the plaintiff's former treating physician. The plaintiff moved to bar future conferences between defendants' representatives and any of the plaintiff's treating physicians, and the trial court granted the motion, finding that public policy precludes such conferences. The Illinois Appellate Court affirmed, stressing that "modern public policy strongly favors the confidential and fiduciary relationship existing between a patient and his physician." 102 Ill.Dec. at 177, 499 N.E.2d at 957. The appellate court listed a number of sources of this public policy, including the Hippocratic Oath, the American Medical Association's Principles of Medical Ethics, the Current Opinions of the Judicial Council of the AMA (1984 ed.) and societal and individual perceptions and expectations of the physician-patient relationship. The court concluded, "Accordingly, we join the growing number of courts which have found that public policy strongly favors the confidentiality of the physician-patient relationship and thereby prohibits, because of the threat posed to the sanctity of that relationship, extra-judicial *ex parte* discussion of a patient's medical confidences." *Id.* 102 Ill.Dec. 177, 499 N.E.2d at 957. In short, the *Petrillo* court relegated defense counsel to formal discovery procedures when dealing with a plaintiff's treating physician.

Another opinion prohibiting *ex parte* interviews by defense counsel of a plaintiff's treating physician is *Anker v. Brodnitz,* 98 Misc.2d 148, 413 N.Y.S.2d 582 (N.Y.Sup.Ct. 1979). The *Anker* court followed the same public policy rationale set forth in *Petrillo* and likewise limited defense counsel to formal discovery methods in communicating with a plaintiff's treating physician. The *Anker* court also noted:

> To permit private interviews upon the service of a complaint would subject physicians to improper pressures to disclose.... Moreover, a doctor who is himself insured by the same carrier that insures a defendant may wrongfully feel compelled to make improper disclosures to the carrier. Compliance with formal discovery procedures would insulate a physician against such improper pressures.

413 N.Y.S.2d at 585. *See also Hammonds v. Aetna Casualty & Surety Co.,* 243 F.Supp. 793 (N.D.Ohio 1965).

In a unanimous opinion, the Supreme Court of New Jersey took a more moderate position on the *ex parte* contacts issue in *Stempler v. Speidell,* 100 N.J. 368, 495 A.2d 857 (1985). On the one hand, the court in *Stempler* noted, "[T]here is a clear recognition that, in general, a physician does have a professional obligation to maintain the confidentiality of his patient's communications." 495 A.2d at 860. On the other hand, the court expressed concern that "requiring the formality of depositions would impose unnecessary cumbersome restrictions on [defense counsel's] right to prepare for trial," and the court recognized that depositions are often "impractical, inefficient, and costly." *Id.* 495 A.2d at 862. The court also emphasized the need to discover the truth and pointed out that no party to litigation has any type of a proprietary right to any witness' evidence. In an attempt to satisfy the competing concerns of the plaintiff/patient and defense counsel, the *Stempler* court held that defense counsel may conduct *ex parte* interviews with a plaintiff's treating physician but only after following a procedure which includes providing adequate notice to plaintiff or his counsel. The court observed:

> In our view, these competing interests can be respected adequately without requiring the formality of depositions in

every case. The Rules regulating pretrial discovery do not purport to set forth the only methods by which information pertinent to the litigation may be obtained. Personal interviews, although not expressly referred to in our Rules, are an accepted, informal method of assembling facts and documents in preparation for trial. Their use should be encouraged as should other informal means of discovery that reduce the cost and time of trial preparation.

Since it is unrealistic to anticipate that decedent's physicians will participate in such interviews without plaintiff's consent, plaintiff's counsel should provide written authorization to facilitate the conduct of interviews. If such authorizations are withheld unreasonably, their production can be compelled, as in this case, by motion. However, conditions should be imposed in the authorizations, or in orders compelling their issuance, that require defendant's counsel to provide plaintiff's counsel with reasonable notice of the time and place of the proposed interviews. Additionally, the authorizations or orders should require that defendant's counsel provide the physician with a description of the anticipated scope of the interview, and communicate with unmistakable clarity the fact that the physician's participation in an *ex parte* interview is voluntary. This procedure will afford plaintiff's counsel the opportunity to communicate with the physician, if necessary, in order to express any appropriate concerns as to the proper scope of the interview, and the extent to which plaintiff continues to assert the patient-physician privilege with respect to that physician.

Plaintiff may also seek and obtain a protective order if under the circumstances a proposed *ex parte* interview with a specific physician threatens to cause such substantial prejudice to plaintiff as to warrant the supervision of the trial court. Such supervision could take the form of an order requiring the presence of plaintiff's counsel during the interview or, in extreme cases, requiring defendant's counsel to proceed by deposition. We are satisfied that the flexibility afforded by our decision will permit the courts and counsel to fashion appropriate procedures in unusual cases without interfering unnecessarily with the use of personal interviews in routine cases.

*Id.* 495 A.2d at 864–65.

*Doe v. Eli Lilly & Co., Inc.,* 99 F.R.D. 126 (D.D.C.1983), is representative of a number of decisions from other jurisdictions which permit *ex parte* communications between defense counsel and a plaintiff's treating physician. The *Doe* court required the plaintiffs to execute written authorizations addressed to their treating physicians allowing the doctors to engage in *ex parte* meetings with defense counsel. The court commented, "Unless impeded by privilege an adversary may inquire, in advance of trial, by any lawful manner to learn what any witness knows ..., and while the Federal Rules of Civil Procedure have provided certain specific formal methods of acquiring evidence from recalcitrant sources by compulsion, they have never been thought to preclude the use of such venerable, if informal, discovery techniques as the *ex parte* interview of a witness who is willing to speak." 99 F.R.D. at 128. The court pointed out, "The potential for influencing trial testimony is inherent in every contact between a prospective witness and an interlocutor, formal or informal, and what a litigant may justifiably fear is an attempt by an adversary at *improper* influence for which there are sanctions enough if it occurs" (emphasis in original). *Id.* Finally, the court observed that *ex parte* interviews are often preferred over depositions because the former are "less costly and less likely to entail logistical or scheduling problems ... [are] conducive to spontaneity and candor in a way depositions can never be ... [and are] cost-efficient means of eliminating non-essential witnesses from the list completely." *Id.* *But see Alston v. Greater Southeast Community Hosp.,* 107 F.R.D. 35 (D.D.C.1985) (motion to compel plaintiff to authorize his treating physician to speak with defense counsel was denied in light of the "substantial" reasons for limiting defense counsel

to formal depositions of a plaintiff's treating physician).

Cases adhering to the *Doe* rationale include *Green v. Bloodsworth*, 501 A.2d 1257 (Del.Super.Ct.1985), and *Stufflebam v. Appelquist*, 694 S.W.2d 882 (Mo.Ct.App.1985). Both courts required the plaintiffs to sign forms authorizing *ex parte* contacts between defense counsel and the plaintiff's treating physicians. Both courts stressed that once a plaintiff files a lawsuit based upon physical or mental injuries, he removes all barriers surrounding his treating physicians. In fact, the *Green* court stated, "Not only is there no express law or rule prohibiting defense counsel from obtaining information from a plaintiff's physician through informal discussion, there is no public policy consideration favoring nondisclosure when no privilege exists." 501 A.2d at 1258. The *Stufflebam* court indicated that "permitting one attorney to overhear his opponent's interrogation of a witness might invade the work product of the opponent and lay bare matters of trial strategy and mental impressions or legal theories of the opponent." 694 S.W.2d at 888.

## DISCUSSION

Certain observations are appropriate at this juncture regarding the prohibition against unauthorized *ex parte* contacts established by *Alexander* and its progeny and recognized in several decisions across the country. First, the basis of the prohibition is public policy, *i.e.*, the desire to protect the confidential nature of the physician-patient relationship. The prohibition is derived from neither statute nor established common law; rather, it is an emerging court-created effort to preserve the treating physician's fiduciary responsibilities during the litigation process.[7] "Modern public policy, not the archaic whims of the common law, demands that doctors obey their implied promise of secrecy." *Hammonds v. Aetna Casualty and Surety Co., supra,* at 796.

■ The prohibition against unauthorized *ex parte* contacts between defense counsel and a plaintiff's treating physician is, moreover, completely separate and distinct from the statutory physician-patient privilege codified at 42 Pa.C.S.A. § 5929. It is clear that a plaintiff/patient waives his statutory privilege by filing a lawsuit; the *Alexander* line of cases, each of which was rendered subsequent to the enactment of the statutory privilege, recognizes this waiver. In fact, the courts in *Shea, Freyer* and *McNally* expressly ruled that the statutory physician-patient privilege was inapplicable and then went on to condemn unauthorized *ex parte* interviews of a plaintiff's treating physician on the independent ground of public policy.[8]

The distinction between the statutory privilege and the prohibition against unauthorized *ex parte* contacts is further evidenced by comparing the purpose or function of each. The statutory privilege determines whether certain information may be disclosed. In contrast, the prohibition against unauthorized *ex parte* contacts regulates only how defense counsel may obtain information from a plaintiff's treating physician, *i.e.*, it affects defense counsel's methods, not the substance of what is discoverable. Consequently, the court finds little merit in defendants' argument that the prohibition against unauthorized *ex*

---

7. There was no physician-patient privilege at common law. *Commonwealth v. Sykes*, 353 Pa. 392, 45 A.2d 43 (1946).

8. Specifically, the court in *McNally* declared that the waiver of the statutory physician-patient privilege does not mean that the plaintiff's treating physician "is accessible to defendants for an *ex parte* interview before trial, or freely retainable as an expert by the defendants." 46 Northampton Rep. at 204. *See also Petrillo v. Syntex Laboratories, Inc.,* 102 Ill.Dec. at 179, 499 N.E.2d at 959 ("[W]hen a patient files suit, he consents only to the release of certain information; he does not automatically consent to the termination of the confidential relationship existing between him and his physician."). The court in *Stempler v. Speidell, supra,* began its analysis by noting that New Jersey's statutory physician-patient privilege was inapplicable; the court continued its analysis by closely examining independent public policy considerations surrounding unauthorized *ex parte* interviews by defense counsel of a plaintiff's treating physician.

*parte* contacts is an unacceptable burden on their search for the truth.

Defendants reject the dichotomy between the statutory physician-patient privilege and the court-created public policy prohibition against unauthorized *ex parte* contacts. For example, defendants cite *Feingold v. S.E.P.T.A.*, 512 Pa. 567, 517 A.2d 1270 (1986), for the proposition that unauthorized *ex parte* communications are permissible. In *Feingold*, the trial court denied the defense leave to call the plaintiff's treating physician as a witness at trial because the doctor's name was not listed in the defendant's pretrial statement. Finding that the physician's testimony was improperly excluded, the Pennsylvania Supreme Court provided no indication that any unauthorized meeting between defense counsel and the treating physician had taken place. The plaintiff in that case argued that the exclusion of his physician's testimony was merited because "the privilege of communication between a doctor and his patient precludes the admission of such testimony at trial." 512 Pa. at 574, 517 A.2d 1270. The Supreme Court rejected this contention, determining that the statutory physician-patient privilege set forth at 42 Pa.C.S.A. § 5929 had been waived by the initiation of the lawsuit. The court in *Feingold* did not discuss the prohibition against unauthorized *ex parte* contacts. This court, then, does not read the brief reference in the *Feingold* opinion as repudiating, or even addressing, the holdings of *Alexander* and its progeny.

■ Another important characteristic of the prohibition against unauthorized *ex parte* communications is that the decision to waive the prohibition belongs to the plaintiff/patient. *See McNally v. Easton Hospital, supra,* at 205. Thus, the fact that Drs. Ambruso and Kao were willing to speak with Dr. D'Anca's counsel does not validate the *ex parte* communications between these individuals. In addition, the prohibition extends beyond the termination of medical treatment and applies with equal force to a plaintiff's current and former treating doctors. *See, e.g., Shea v. McCadden, supra;* and *Freyer v. The*

*Travelers Indemnity Co., supra.* Finally, the prohibition is not limited to medical malpractice actions. *Id.*

■ This court finds merit in the rationale underlying the prohibition against unauthorized *ex parte* contacts of a plaintiff's treating physician by defense counsel. Physicians owe a fiduciary duty to their patients not to disclose their patients' confidences in order to encourage all persons to speak with their physicians openly and accurately about their medical history, symptoms, etc. Although a plaintiff/patient subjects his relevant medical information to discovery by instituting a civil action, he does not necessarily give his treating physician carte blanche to speak freely on all the information which was disclosed to the doctor. *See Petrillo v. Syntex Laboratories, Inc.,* 102 Ill.Dec. at 179, 499 N.E.2d at 959; and *Stempler v. Speidell,* 495 A.2d at 864 (The plaintiff/patient's "primary" interest "is the desire to protect from disclosure by the physician confidential information not relevant to the litigation and therefore still protected by . . . the physician's professional obligation to protect confidentiality"; a physician, then, should not be permitted to "gossip" about his patient's health). When a plaintiff's treating physician is interviewed *ex parte* by defense counsel without prior notice to the plaintiff or his counsel, there are no safeguards against the revelation of matters irrelevant to the lawsuit and personally damaging to the plaintiff/patient, and the potential for breaches in the confidentiality between a patient and his physician could have a chilling effect upon the patient-physician relationship.

Furthermore, the unauthorized *ex parte* interview of a plaintiff's treating physician by defense counsel creates a situation which may invite questionable conduct. This court will not overlook the current concerns in the medical malpractice insurance industry and the attitudes of physicians and carriers alike. An unauthorized *ex parte* interview could disintegrate into a discussion of the impact of a jury's award upon a physician's professional reputation, the rising cost of malpractice insurance premiums, the notion that the treating phy-

sician might be the next person to be sued, and other topics which might influence the treating physician's views. The potential for impropriety grows even larger when defense counsel represents the treating physician's own insurance carrier and when the doctor, who typically is not represented by his personal counsel at the meeting, is unaware that he may become subject to suit by revealing the plaintiff/patient's confidences which are not pertinent to the pending litigation.

Counsel for Dr. D'Anca adamantly denies that any unethical or improper conduct took place during his communications with Drs. Ambruso and Kao. Counsel for Dr. D'Anca enjoys an excellent professional reputation, and the court has been presented with no allegations or evidence which would cause it to question defense counsel's summary of the events surrounding the conversations in question. Nonetheless, any unauthorized *ex parte* contact between defense counsel and a plaintiff's treating physician violates the public policy enunciated in the *Alexander* line of cases. Moreover, on the issue of unauthorized *ex parte* conferences, this court prefers a general standard applicable in all cases rather than a rule requiring the court in each instance to examine the *ex parte* meeting in order to determine if the plaintiff has been unfairly prejudiced thereby.

In view of (1) the *Alexander* line of cases, (2) decisions from outside Pennsylvania such as *Petrillo v. Syntex Laboratories, Inc., supra,* and *Stempler v. Speidell, supra,* and (3) the rationale supporting the prohibition against unauthorized *ex parte* contacts, this court believes that the Pennsylvania Supreme Court, if confronted with the issue, would *at least* require reasonable notice to a plaintiff or his counsel before defense counsel may communicate with plaintiff's treating physician. This approach fosters harmony and confidentiality between physician and patient because it enables the plaintiff's counsel (1) to notify the doctor of the limits of valid questioning

as well as the possibility of personal liability of the physician in the event of improper disclosures, or (2) to seek a protective order when unusual circumstances exist. *See Stempler v. Speidell,* 495 A.2d 864–65. Under such a scheme, any infringement upon defense counsel's search for the truth is slight and is far outweighed by the protection afforded to the peculiar relationship between a patient and his physician.[9]

Defense counsel maintains that allowing plaintiff's counsel to reach the treating physician first would have a chilling effect upon any subsequent *ex parte* meeting between the doctor and defense counsel. Yet, as discussed above, permitting defense counsel to make the initial contact with the treating physician without notice to the plaintiff or his counsel creates a situation wherein irrelevancies could be discussed and improper conduct could take place. Given that there is potential encroachment on the search for truth no matter which side makes the initial contact with a treating physician, the fiduciary duty owed by the physician to his patient dictates that the plaintiff's counsel be guaranteed at least advance notice of any *ex parte* communication between defense counsel and the physician. In addition, plaintiff's counsel normally does not possess leverage to improperly influence the physician, *i.e.,* by warning the physician about his potential personal liability and by objecting to irrelevant questions before the *ex parte* interview occurs, plaintiff's counsel acts no differently than he could in a deposition setting.

■ It is undisputed in the present case that counsel for Dr. D'Anca failed to provide prior notice to plaintiff's counsel of the communications with Drs. Ambruso and Kao. The public policy favoring confidentiality between a physician and his patient compels this court to preclude defense counsel from calling Drs. Ambruso and

---

**9.** In the *Doe, Green* and *Stufflebam* cases, the courts compelled the plaintiffs to sign authorization forms allowing their treating physicians to meet with defense counsel. Thus, while these courts permitted *ex parte* interviews, the plaintiffs had already received advance notice of the meetings.

**596**

Kao as expert witnesses at trial.[10]

■ The court's ruling is unaltered by the prospect that Drs. D'Anca and Weisbaum will be dismissed from this action, with N.P.W. remaining as the sole defendant. Counsel for N.P.W. has indicated his intent to meet with plaintiff's former treating physicians and to call them as expert witnesses at trial. Inasmuch as the unauthorized *ex parte* contacts between D'Anca's counsel and Drs. Ambruso and Kao in early 1987 led to a situation wherein plaintiff's former treating physicians have refused even to speak with plaintiff's counsel, notice of future meetings between N.P.W.'s counsel and the treating physicians would be meaningless since plaintiff's counsel would be unable to protect his client's interests by discussing matters with Ambruso and Kao prior to their communications with N.P.W.'s counsel. Moreover, N.P.W.'s counsel and D'Anca's counsel share identical interests in this case, *i.e.*, both have attempted to establish that the x-rays taken at N.P.W. on July 1, 1984 were adequate, that these x-rays revealed no fracture of the cervical spine and that plaintiff's injuries do not stem in any way from the delay in diagnosing and treating his cervical fracture. Following their *ex parte* discussions with D'Anca's counsel, Ambruso and Kao rendered opinions supporting the defendants' position on each of these issues. Further, after conducting scheduling and pretrial conferences in this matter, it is apparent that defense counsel were acting in unison in marshaling expert evidence. N.P.W.'s counsel thus benefitted from the *ex parte* communications in question. Finally, any expert testimony provided at trial by Ambruso and Kao on behalf of N.P.W. would inevitably carry at least the appearance of being tainted by their unauthorized *ex parte* contacts with D'Anca's counsel. Under these circumstances, public policy is best served by precluding N.P.W.'s counsel from calling Ambruso and Kao as expert witnesses at trial.

The trial in this case has been continued, and N.P.W.'s counsel will be afforded ample opportunity to obtain other expert witnesses if such are needed.

In light of the court's holding that defense counsel must provide reasonable notice to the plaintiff or his counsel before *ex parte* contacting the plaintiff's treating physician, which notice was not furnished in this case, this court need not decide whether plaintiff's counsel has a right to be present when defense counsel meets informally with a treating physician, whether defense counsel must proceed through formal discovery procedures to elicit information from a treating physician or whether a treating physician may ever serve as an expert witness at trial on behalf of the defense.

For the reasons set forth above, plaintiff's motion in limine will be granted.

An appropriate Order will enter.

### ORDER

NOW, this 8th day of December, 1987, in accordance with the reasoning set forth in the accompanying Memorandum, IT IS HEREBY ORDERED THAT:

(1) Plaintiff's motion in limine is granted.

(2) Defense counsel is precluded from future contacts with any of plaintiff's former or current treating physicians unless reasonable advance notice is provided to plaintiff or his counsel.

(3) Defense counsel is precluded from calling Drs. Ambruso and Kao as expert witnesses at trial.

---

**10.** *But see Schwartz v. Goldstein,* 400 Mass. 152, 508 N.E.2d 97 (1987) (exclusion of the testimony of a treating physician who had participated in an unauthorized *ex parte* discussion with defense counsel is too severe; proper remedy is a separate action against the physician for breach of confidentiality). This court queries whether the *Schwartz* approach adequately protects the plaintiff/patient and his treating physician and whether it encourages unnecessary litigation.