## Hlatky v. Jaeger

*Clifford E. Haines,* for plaintiffs.
*James A. Doherty,* for defendants.

BLACK, *P.J.,* December 17, 2007—This is a medical malpractice case brought by the plaintiffs, John Hlatky and Rosemarie Hlatky, arising from medical care rendered to Mrs. Hlatky by the defendant Randy Jaeger M.D., an orthopedic surgeon employed by the defendant Lehigh Valley Orthopedics. Dr. Jaeger operated on Mrs. Hlatky's hip in October and November 2000 after she fractured it in a fall at work. Prior to trial the plaintiffs discontinued their claims against various co-defendants.

The plaintiffs' case against Dr. Jaeger and Lehigh Valley Orthopedics was tried to jury verdict from March 27, 2007, through April 4, 2007. The jury found in favor of the defendants. The plaintiffs have timely filed a motion for post-trial relief, which is now before the court for disposition.

The plaintiffs' post-trial motion asserts (1) that the jury's verdict was against the weight of the evidence; (2) that the court erred in permitting Dr. Leo Scarpino to be qualified as an expert during the trial; and (3) that the

court erred in admitting into evidence a nurse's note that Sacred Heart Hospital (not the current defendants) had failed to produce to the plaintiffs' counsel during pretrial discovery. For the reasons stated below, we find no merit in the plaintiffs' motion, and it is therefore denied.

## FACTUAL BACKGROUND

On October 27, 2000, the plaintiff Rosemarie Hlatky was working as a sleep technologist at Sacred Heart Hospital when she fell over a housekeeping cart and struck the floor, causing a fracture to the head of her left femur. The defendant Randy Jaeger M.D., the hospital's on-call orthopedic surgeon, was called to assess Mrs. Hlatky's condition. He determined that her fracture required surgery, specifically that it be set with pins and screws. The next day, October 28, 2000, Mrs. Hlatky was taken to the operating room at Sacred Heart Hospital where Dr. Jaeger performed the repair. Post-operative x-rays were interpreted by a radiologist as showing possible evidence of a surgical screw protruding beyond the femoral head into the acetabulum or hip socket. However, after reviewing the x-ray films, Dr. Jaeger disagreed with this interpretation and determined that the surgical screws were appropriately placed.

On November 1, 2000, Mrs. Hlatky was moved to the rehabilitation floor of the hospital, which was then run by Moss Rehabilitation. Mrs. Hlatky had been instructed by Dr. Jaeger to begin rehabilitation of her hip by putting weight on it as tolerated. She underwent a course of physical therapy under the direction of Moss Rehabilitation. When she experienced pain that seemed disproportionate to the injury and surgery, additional radiographic studies were performed, including a CAT scan

of the hip on November 8, 2000. The CAT scan showed that one or more of the screws was in fact protruding beyond the femoral head into Mrs. Hlatky's hip joint. As a result, revision surgery was required.

On November 10, 2000, Mrs. Hlatky was readmitted to Sacred Heart Hospital where Dr. Jaeger performed revision surgery of her hip fracture the following day. During this procedure Dr. Jaeger replaced all the screws with smaller ones to address the protrusion that had been causing Mrs. Hlatky's considerable pain. Mrs. Hlatky was then readmitted to Moss Rehabilitation for additional physical therapy and was discharged to home on December 9, 2000.

Following the revision surgery, Mrs. Hlatky's pain did not abate. After several months of ongoing out-patient rehabilitation Mrs. Hlatky was seen by Dr. Leo Scarpino, also an orthopedic surgeon and Dr. Jaeger's partner. Dr. Scarpino recommended a hip replacement. As a result, Mrs. Hlatky was readmitted to Sacred Heart Hospital on April 18, 2001, for hip replacement surgery. Because of damage to the hip socket observed by Dr. Scarpino during the surgery, he found it necessary to do a total hip replacement.

Despite the total hip replacement, Mrs. Hlatky continues to experience considerable pain. This pain has continued even though she underwent a second hip replacement performed in Philadelphia by William Hozack M.D., in September 2005.

## STANDARD OF REVIEW

In *Harman ex rel. Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116 (2000), our Supreme Court re-examined the appropriate standard of review of a motion for a new

trial at both the trial court and appellate levels. When responding to a request for a new trial, the trial court must follow a two-step process. *Id.* at 467, 756 A.2d at 1122. The trial court must first determine whether one or more errors occurred during the trial. *Id.* If the trial court concludes that an error occurred, the court must then determine whether the error is a sufficient basis for granting a new trial. *Id.* A new trial is not warranted merely because some irregularity occurred during the trial or because another trial judge would have ruled differently. The moving party must demonstrate prejudice resulting from the mistake. *Id.*

## DISCUSSION

### I. *The Jury Verdict and the Weight of the Evidence*

In their motion for post-trial relief the plaintiffs allege that the jury's verdict was against the "great weight of the evidence"[1] and request that it be set aside with judgment to be entered in favor of the plaintiffs. In their brief, the plaintiffs limit their request to a new trial.

The trial court has inherent power to grant a new trial and a duty to do so when the court believes that the verdict was against the weight of the evidence and resulted in a miscarriage of justice. *Thompson v. City of Philadelphia,* 507 Pa. 592, 493 A.2d 669 (1985). However, a new trial is not to be granted unless the evidence supporting the verdict is so inherently improbable or at variance with admitted or proven facts or with ordinary experience as to render the verdict shocking to the court's sense of justice. *Fogg v. Paoli Memorial Hospital,* 455

---

[1]. Plaintiffs' motion for post-trial relief, p. 1.

Pa. Super. 81, 686 A.2d 1355 (1996); *Houseknecht v. Walters,* 404 Pa. Super. 85, 590 A.2d 20 (1991). A new trial is not to be granted merely because the jury could have drawn different conclusions or inferences. *Sundlun v. Shoemaker,* 421 Pa. Super. 353, 361, 617 A.2d 1330, 1334-35 (1992).

In this case, substantial evidence was presented by both sides. The case was well-tried. Although the jury could have reached a different conclusion from the evidence presented, we cannot say that the evidence supporting the verdict is inherently improbable, at variance with admitted or proven facts, or at variance with ordinary experience, so as to shock our sense of justice.

The evidence indicated clearly that the fracture of Mrs. Hlatky's femoral head did not fuse after the initial surgery. However, the plaintiffs' own expert witness, Dr. Herbert Ratner, testified that a hip fracture such as this has a 20 percent chance of a non-union, even with the best of medical care.[2]

The evidence also indicated that at least one of the three screws used by Dr. Jaeger in his initial surgical repair penetrated through the femoral head. The plaintiffs do not contend that this was negligence per se, but argue that Dr. Jaeger should have recognized this protrusion sooner and taken Mrs. Hlatky back to surgery earlier than he did. However, the penetration of a screw was not confirmed until the CAT scan of November 8, 2000, and Mrs. Hlatky was taken to surgery on November 10, 2000, two days thereafter.

The plaintiffs argued to the jury that Dr. Jaeger should have acted sooner because of a report from Dennis Splain

---

2. Notes of Testimony (N.T.) 3/29/2007, 96.

D.O., a radiologist for the hospital, shortly after the initial surgery. Dr. Splain's report on the post-surgery x-rays indicated that one of the pins could possibly be protruding beyond the femoral head. However, Dr. Jaeger looked at the films himself and concluded that they did not demonstrate any pin protrusion. Dr. Prody Ververeli, who testified as an expert witness for the defense, stated that the pin protrusion could not be confirmed prior to the November 8, 2000 CAT scan because only the CAT scan provided a three-dimensional vision of the actual screws. According to Dr. Ververeli, the prior x-rays were inconclusive and did not allow a definitive determination regarding the existence of pin protrusion.[3] Once the pin protrusion was confirmed by the CAT scan of November 8, 2000, Dr. Jaeger ordered Mrs. Hlatky to surgery, which was performed on November 10, 2000. This was within the two or three days that Dr. Ververeli opined was the standard of care to address such a problem.[4] Dr. Ververeli agreed that prior to the November 8, 2000 CAT scan there was nothing that "mandates immediate revision surgery by an orthopedic surgeon such as Dr. Jaeger, treating a patient such as Mrs. Hlatky."[5]

Although the plaintiffs argue that Dr. Ververeli's testimony supported their position, we find just the opposite. In the course of his testimony, he indicated no less than six times that he believed to a reasonable degree of medical certainty that Dr. Jaeger provided reasonable care to the plaintiff consistent with the standard of care for the type of medical issues presented.[6]

---

3. N.T. 4/2/07, 173, 208, 210 and 211.
4. *Id.* at 210.
5. *Id.* at 167.
6. *Id.* at 160, 172, 173, 174, 197 and 220.

For these reasons, the jury finding that Dr. Jaeger was not negligent was not against the weight of the evidence so as to justify a new trial.

## II. *The Testimony of Dr. Leo Scarpino*

The plaintiffs contend that the court erred in allowing Dr. Leo Scarpino, an orthopedic surgeon, to be qualified as an expert witness. In their pretrial memorandum, the defendants had listed Dr. Scarpino as a witness, but he was not identified as an expert. Plaintiffs' counsel deposed Dr. Scarpino prior to trial and was aware of his qualifications as an orthopedic surgeon. Plaintiffs' counsel also examined Dr. Scarpino's office notes regarding the treatment that he rendered to Mrs. Hlatky, and was aware of his findings and of the treatment he provided. Moreover, on the first day of trial the *plaintiffs* called Dr. Scarpino as their witness and elicited from him his medical background and his treatment of Mrs. Hlatky. Plaintiffs' counsel did not formally qualify Dr. Scarpino as an expert, but did ask him questions that required him to provide information based on his experience as an orthopedic surgeon.

Later, on the fourth day of trial, Dr. Scarpino was again called as a witness, this time by the defendants on their side of the case. Dr. Scarpino was again asked questions regarding the care and treatment he had rendered to Mrs. Hlatky following Dr. Jaeger's surgery. Defendants' counsel then posed this question to Dr. Scarpino:

"Very well. I am going to ask you to assume that this jury was told yesterday by Dr. Ratner that a hip fracture such as this has a 20 percent chance of a non-union.

Doctor, is that consistent with your understanding of the medicine of this hip fracture?"[7]

Plaintiffs' counsel immediately objected to this question, and the objection was sustained on the ground that Dr. Scarpino had not been qualified as an expert. Defendants' counsel then proceeded to qualify the witness. Plaintiffs' counsel then further objected on the ground that Dr. Scarpino had not been identified as an expert in the defendants' pretrial memorandum. In response, defendants' counsel stated that the witness was merely going to "offer an opinion regarding his care of the treatment of the procedures—or excuse me—of the conditions that were presented to him."[8] The objection of plaintiffs' counsel was then overruled since Dr. Scarpino had been listed as a witness and had been called by the plaintiffs themselves previously on the care and treatment of the conditions presented to him.

Shortly afterwards, Dr. Scarpino was asked by defendants' counsel "What is your experience—what is your understanding of the failure rate, the non-union rate, of fractures of this type?"[9] Again plaintiffs' counsel objected, but qualified his objection. He indicated that if the question was limited to Dr. Scarpino's individual experience, then he had no objection.[10] Defendants' counsel then limited his question to the doctor's own experience. He asked, "What is your experience, Doctor?", to which Dr. Scarpino answered "Approximately 20 to 25 percent."[11]

---

7. N.T. 3/30/07, 68.
8. *Id.* at 71.
9. *Id.* at 72.
10. *Id.* at 72-73.
11. *Id.* at 73.

28

This answer happened to be virtually the same answer given by Dr. Herbert Ratner, the plaintiffs' expert witness. On the plaintiffs' side of the case, Dr. Ratner had testified that in cases of this nature there was a 20 percent chance of non-union even if the surgery by Dr. Jaeger had been performed in accordance with the standard of care. Therefore, regardless whether Dr. Scarpino should have been permitted to give this opinion, it could not possibly have prejudiced the plaintiffs' case because it confirmed and validated the opinion of the plaintiffs' own expert witness.

The plaintiffs argue that regardless of the substance of Dr. Scarpino's testimony, the mere fact that the court allowed him to be qualified as an expert in the field of orthopedic surgery lent greater importance to his testimony than his testimony might otherwise have had. We find this argument unconvincing. The plaintiffs themselves, as noted above, called Dr. Scarpino to the stand and elicited from him his background as an orthopedic surgeon. It is inconceivable that the trial judge's pronouncement that Dr. Scarpino was qualified as an expert in the field of orthopedic surgery caused any change in the jury's perception of his expertise.[12] The plaintiffs have been unable to identify any opinion that Dr. Scarpino offered that was prejudicial to their case, other than his description of his care and treatment of the patient, which was thoroughly explored by the plaintiffs in their pretrial deposition. Thus, there was no conceivable surprise or prejudice to the plaintiffs in the qualification of

12. It should be noted that Dr. Scarpino was precluded from offering an opinion regarding x-rays of Mrs. Hlatky because at his deposition he had stated that he was not going to testify regarding the x-rays. N.T. 3/30/07, 91.

Dr. Scarpino. See *Feingold v. SEPTA,* 512 Pa. 567, 517 A.2d 1270 (1986); and *Royster v. McGowen Ford Inc.,* 294 Pa. Super. 160, 168, 439 A.2d 799, 804 (1982) (prejudice to the complaining party must be shown).

### III. *The Nurse's Note*

The nurse's note, defendants' exhibit 16, presented a complicated issue at trial. The note, which was part of the medical records of Sacred Heart Hospital pertaining to Mrs. Hlatky, indicated that on November 1, 2000, three days after her initial surgery, she had complained of left hip pain after "bumping" her hip on a door handle.

At the beginning of the trial the parties stipulated to the authenticity and admissibility of the medical records of Sacred Heart Hospital.[13] However, in the course of the trial, after reference was made to this nurse's note, plaintiffs' counsel stated that he had never received from the hospital the page in its records that contained this note. According to plaintiffs' counsel, as part of the pretrial discovery he had obtained what he assumed was a full set of the medical records from Sacred Heart Hospital, but that one page of this voluminous record, *i.e.,* the nurse's note about a "bumping" incident, was never provided to him.

Reference to the note was first made on the fourth day of the trial when Dr. Scarpino was called as a witness by the defense. Dr. Scarpino stated on his direct examination:

"She (Mrs. Hlatky) had bumped her hip on a doorknob and they were concerned about increased pain. I ordered an x-ray of the hip at that point in time. I reviewed it.

---

13. Plaintiffs' exhibit 1.

The x-ray showed that there was no change in position of the fracture, and then she was transferred to Moss Rehab."[14]

At this point defendants' counsel produced the nursing note and intended to ask Dr. Scarpino about it for the purpose of explaining why he had ordered the x-ray of Mrs. Hlatky's hip at that point in time. Plaintiffs' counsel stated that he had never seen the note before, whereupon the court ordered a side-bar conference. In the side-bar conference plaintiffs' counsel represented to the court that he had not been provided with the page from the Sacred Heart Hospital records containing the note despite his discovery request to Sacred Heart Hospital requesting all records pertaining to Mrs. Hlatky.

The note, therefore, presented a troubling dilemma for the court. On the one hand, the plaintiffs were undoubtedly prejudiced by not having received this note in advance of trial. On the other hand, the defendants had nothing to do with the fact that this note was not supplied to plaintiffs' counsel by Sacred Heart Hospital, and the defendants would have been prejudiced if they were denied an opportunity to defend themselves with relevant evidence. After review of the note it was evident that circumstances surrounding the incident and the severity of the incident were unknown. We concluded, therefore, that the trustworthiness of the nurse's note had not been established, and we excluded the note from evidence on that basis.[15]

---

14. N.T. 3/30/07, 46-47.

15. *Id.* at 113; see Pa.R.E. 803(6) and Leonard Packel and Anne Bowen Poulin, *Pennsylvania Evidence,* §803(6)-1 at 866-67 (3d ed. 2007) (records may be excluded where the source of the information is unclear).

We had expected plaintiffs' counsel to move for a mistrial when the discrepancy in the Sacred Heart Hospital records was disclosed, and we would surely have granted such a motion. However, plaintiffs' counsel did not move for a mistrial. A trial court may grant a mistrial sua sponte, but only in exceptional circumstances where there is a manifest necessity.[16] That threshold was not reached here.

The issue of the nurse's note resurfaced on the next day of the trial, day five,[17] during the cross-examination of Dr. Jaeger by plaintiffs' counsel. Dr. Jaeger had just testified that the screws he placed in Mrs. Hlatky's femoral head could have moved forward after surgery because of an inadequacy in her bone. Plaintiffs' counsel then asked:

"Q. Well, did you have some other explanation for that?

"A. Well, that's one of the explanations. Another explanation is when Dr. Scarpino mentioned that he was notified that she (Mrs. Hlatky) had hit her hip against the door handle.

"Q. Doctor, did you have any information about Mrs. Hlatky hitting her hip on the door handle?

"A. I can't recall now whether I did or not, at that time.

"Q. Well, Doctor, if this woman hit her hip to the extent that she could have dislodged one of the pins, that's something that you as her treating physician, would want to check up on, wouldn't you?

16. 75B Am.Jur.2d Trial § 1469 (2007).

17. Day five of the trial was Monday, April 2, 2007. Three calendar days had elapsed after day four of the trial, which was Friday, March 30, 2007.

"A. I would imagine that Dr. Scarpino probably told me—notified me of that, but can I recall now? No, there is no way I can recall now.

"Q. *Well, Doctor, there is absolutely nothing in the medical records written by you or any other physician that makes any reference anywhere, to a bump of the hip, right?*

"A. *That's correct. But he ordered x-rays when he was notified of that. He didn't just—Dr. Scarpino didn't just order x-rays out of nowhere on that date.*

"Q. *And you know that because what in the record tells you that, Doctor?*

"A. Because it's not his common practice to order x-rays on a patient of mine if there is no reason to get new x-rays." [18]

Later, on redirect examination of Dr. Jaeger, defendants' counsel argued that the door had been opened on the contents of the nurse's note by the cross-examination of plaintiffs' counsel. We agreed, and allowed him to introduce the note into evidence and to question Dr. Jaeger about it. Plaintiffs contend that this was prejudicial error. We disagree.

In view of the strenuous objection of plaintiffs' counsel to the nurse's note three days earlier, we were astonished that he reopened the issue by asking Dr. Jaeger whether there was anything in the medical records that referred to a bump of Mrs. Hlatky's hip. Clearly, there was; and plaintiffs' counsel now on Monday, April 2, 2007, had been aware of the note since the preceding day of trial, Friday, March 30, 2007. Plaintiffs' counsel first asked Dr. Jaeger whether there was anything in the

18. N.T. 4/2/07, 14-15. (emphasis added)

medical records "written by you or any other physician" referring to the bump of the hip. That question almost opened the door. The next question clearly did so. The next question was "And you know that because *what in the record tells you that, Doctor?*" [19]

By asking Dr. Jaeger whether anything in the record tells him that Mrs. Hlatky bumped her hip, plaintiffs' counsel invited defense counsel to elicit from the witness on redirect examination the contents of the nurse's note relating to the bump of the hip. Plaintiffs' counsel was attempting to create the inference that there was nothing in the medical records to support Dr. Jaeger's suggestion that Mrs. Hlatky may have bumped her hip. In that circumstance, it was quite appropriate for defendants' counsel to counter this inference by offering into evidence the nurse's note, which was part of the Sacred Heart Hospital records. See *Commonwealth v. Lewis,* 472 Pa. 235, 372 A.2d 399 (1977) (holding that when a party raises an issue on cross-examination, the trial court may permit redirect examination on that issue in order to dispel any unfair inferences).

The plaintiffs argue that the door was not opened by counsel's cross-examination because Dr. Jaeger did not refer to the nurse's note in responding to counsel's questions. However, once plaintiffs' counsel raised the issue of the medical records and implied by his questions that these records said nothing about a bump of the hip, defense counsel had the right to clarify the matter on redirect examination. The response of Dr. Jaeger, who had apparently forgotten about the note during his cross-examination, does not change the result. By asking Dr. Jaeger what in the medical records indicates that Mrs.

19. *Id.* at 15. (emphasis added)

Hlatky bumped her hip, plaintiffs' counsel waived any objection to the disclosure of the medical record that indicates such an incident.

In addition, we note that Dr. Scarpino had testified previously on day four of the trial, without objection, that Mrs. Hlatky had bumped her hip on a doorknob on November 1, 2000.[20] Hence, this fact was already a matter of record. Consequently, the admission of the nurse's note, whether or not in error, cannot be considered a prejudicial error, so as to justify a new trial.

For all the foregoing reasons, the plaintiffs' motion for new trial must be denied.

---

20. N.T. 3/30/07, 46-47.